**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CENTRALSQUARE TECHNOLOGIES LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EAGLE POINT CREDIT COMPANY INC.; EAGLE POINT CREDIT MANAGEMENT LLC; EAGLE POINT INCOME MANAGEMENT LLC; EAGLE POINT INSTITUTIONAL INCOME FUND; EAGLE POINT INCOME COMPANY INC.; CAPRA IBEX ADVISORS, LLC; CAPRA IBEX CREDIT OPPORTUNITIES, LLC; CAPRA CREDIT MANAGEMENT, LLC; FAIR OAKS INCOME LIMITED; FAIR OAKS CAPITAL LLC; LIVERMORE INVESTMENTS GROUP LIMITED; ELDRIDGE INDUSTRIES, LLC; ELDRIDGE STRUCTURED CREDIT ADVISERS, LLC; PANAGRAM CAPITAL, LLC; PEARL DIVER CREDIT COMPANY INC.; PEARL DIVER CAPITAL LLP; and JOHN DOE CLO EQUITY INVESTORS 1–99,<br><br>Defendants. | Case No. 3:26-cv-00106 |

## TABLE OF CONTENTS


INTRODUCTION .......... 1

A. The U.S. Leveraged Loan Market and CLOs .......... 1

B. CLO Equity Investors Exercise Significant Control Over CLO Managers and the U.S. Leveraged Loan Market .......... 5

C. The LIBOR-to-SOFR Transition .......... 6

D. Defendants' Conspiracy to Inflate Interest Rates .......... 7

I. PARTIES .......... 11

A. Plaintiff .......... 11

B. Defendants .......... 12

1. Eagle Point Defendants .......... 12

2. Capra Ibex Defendants .......... 16

3. Fair Oaks Defendants .......... 16

4. Livermore Defendant .......... 18

5. Eldridge Defendants .......... 18

6. Pearl Diver Defendants .......... 20

7. John Doe Defendants .......... 21

8. References to Defendants .......... 21

9. Agents, Affiliates, and Co-Conspirators .......... 22

II. JURISDICTION AND VENUE .......... 22

III. LEVERAGED LOANS AND CLOS .......... 23

A. An Overview of the U.S. Leveraged Loan Market .......... 23

B. Syndication and Securitization of Leveraged Loan Lifecycle .......... 25

C. CLOs Dominate the U.S. Leveraged Loan Market .......... 27

D. Defendants and the Co-Conspirators Exercise Market Power Through Cross-Ownership of CLOs .......... 30

IV. LEVERAGED LOAN MARKETS TRANSITION FROM LIBOR TO SOFR .......... 34

A. LIBOR's Demise Following Manipulation Scandal .......... 34

B. The Federal Reserve Establishes ARRC to Recommend a LIBOR Replacement for LIBOR-Based Loan Agreements .......... 35

C. The LIBOR Act and Its Limited Application to Leveraged Loans .......... 36

V. DEFENDANTS CONSPIRED TO INFLATE LEVERAGED LOAN INTEREST RATES .......... 37

A. Pre-January 2023: A Competitive Market Forces Loan Prices Below ARRC Recommendations ... 37
B. January 2023: Defendants' Conspiracy Takes Flight ... 41
C. Defendants' Conspiracy Raised Borrowing Costs ... 46
1. Defendants' Conspiracy Artificially Raised Prices of Transitioning Loans as Compared to New Native SOFR Loans ... 49
2. Defendants' Conspiracy Raised Average CSAs ... 54
D. Defendants Are Subject to a DOJ Criminal Investigation ... 56
VI. PLUS FACTORS SUPPORT AN INFERENCE OF CONSPIRACY ... 57
A. Opportunities to Collude and High Level of Interfirm Communication ... 57
B. High Level of Cross-Ownership of CLOs and Leveraged Loans ... 60
C. Common Motive to Conspire ... 63
D. Acts Against Individual Self-Interest ... 63
E. Market Structure Conducive to Collusion ... 64
VII. DEFENDANTS HAD MARKET POWER IN THE RELEVANT ANTITRUST MARKET ... 65
A. The Relevant Product Market Is the Leveraged Loan Market ... 66
B. Alternative Financing Options for Non-Investment Grade Companies Are Not Reasonable Substitutes to Leveraged Loans ... 67
1. Private Loans Are Not a Reasonable Substitute ... 67
2. High-Yield Bonds Are Not a Reasonable Substitute ... 68
3. Equity Financing Is Not a Reasonable Substitute ... 69
C. The Hypothetical Monopolist Test ... 69
D. Defendants Exercised Market Power in the U.S. Leveraged Loan Market ... 70
1. Defendants' Own Statements Confirm Their Market Power ... 70
2. Market Analysts Confirmed Defendants' Market Power ... 72
VIII. ANTITRUST INJURY ... 73
IX. LACK OF COUNTERVAILING FACTORS ... 74
X. CLASS ALLEGATIONS ... 75
XI. CLAIMS FOR RELIEF ... 77
XII. PRAYER FOR RELIEF ... 79
XIII. JURY TRIAL DEMANDED ... 80

Plaintiff CentralSquare Technologies, LLC ("CentralSquare"), on behalf of itself and all others similarly situated, files this Complaint against Defendants Eagle Point Credit Company Inc.; Eagle Point Credit Management LLC; Eagle Point Income Management LLC; Eagle Point Institutional Income Fund; Eagle Point Income Company Inc.; Capra Ibex Advisors, LLC; Capra Ibex Credit Opportunities, LLC; Capra Credit Management, LLC; Fair Oaks Income Limited; Fair Oaks Capital LLC; Livermore Investments Group Limited; Eldridge Industries, LLC; Eldridge Structured Credit Advisers, LLC; Panagram Capital, LLC; Pearl Diver Credit Company Inc.; Pearl Diver Capital LLP; and John Doe CLO Equity Investors 1–99 (collectively, "Defendants"). Plaintiff's allegations are made upon personal knowledge as to Plaintiff and Plaintiff's own acts, investigation of counsel, and information and belief as to all other matters.

## INTRODUCTION

1. The controlling investors of the largest lenders to non-investment grade U.S. companies—equity investors in Collateralized Loan Obligations ("CLOs")—conspired during the LIBOR-to-SOFR transition to artificially inflate interest rates that borrowers paid on their term loans (commonly called "leveraged loans"), in violation of antitrust law.

2. Defendants and other competing CLO equity investors formed a working group to ensure that leveraged loans transitioned from LIBOR-to-SOFR with the highest possible interest rates. As a result of their collective efforts, the leveraged loan borrowers, like Plaintiff CentralSquare, were forced to accept higher interest rates to move their loans to SOFR via contractual amendment prior to the cessation of LIBOR.

### A. The U.S. Leveraged Loan Market and CLOs

3. Leveraged loans are secured loans governed by U.S. law and issued to non-investment grade U.S. companies that seek to borrow funds to finance activities like acquisitions

and stock buybacks. The loans are often originated by a group of lenders (a "syndicate") who collectively fund the loan, sharing the income as well as the risk of default. Leveraged loans are first-lien loans, meaning they have the highest priority claim on the borrower's assets if the borrower defaults.

4. CLOs are issued by a sponsoring bank (or other financial entity) as special purpose vehicles established to purchase and fund a portfolio of leveraged loans. To purchase the leveraged loans, the issuer of the CLO raises money by issuing notes (debt) to investors. The portfolio of leveraged loans are the CLO's assets, and the debt issued by the CLO are its liabilities. Interest and principal received by CLOs on its leveraged loan assets are used to pay interest and principal on the notes the CLO issued.

5. After origination, portions of leveraged loans are typically bought and sold among institutional investors on a large secondary market, including CLOs. In 2023, there were over 1,000 leveraged loans traded in the secondary market, worth approximately $715 billion.

6. Leveraged loans carry floating interest rates that rise or fall over the loan term to protect lenders against interest rate fluctuations. Historically, a loan agreement set the borrower's interest rate as the sum of an index rate such as the London Interbank Offered Rate ("LIBOR") tenor (e.g., one-, three-, or six-month USD LIBOR), plus a margin spread (often 300–600 basis points).[1] When borrowing costs rose—for example, in response to a Federal Reserve interest rate increase—USD LIBOR rates rose in response, increasing borrowers' interest payments. Today, most loans are indexed to the Secured Overnight Financing Rate ("SOFR"), which replaced USD

[1] A basis point ("bps") is a unit of measure used to describe the percentage changes in the value or rate of an instrument. One basis point is equivalent to 0.01%.

LIBOR. SOFR is an interest rate that represents the cost of borrowing money collateralized by U.S. Treasury securities in the repurchase agreement market.

7. As the largest purchasers of leveraged loans, CLOs hold approximately 60%–70% of outstanding leveraged loan value and fund over 60% of newly issued leveraged loans as participants in loan syndicates. While leveraged loans make up the vast majority of most CLO's holdings, second-lien loans comprise up to 3% of a typical CLO's assets.[2] Such loans are subordinated to the borrower's first lien leveraged loan, but otherwise share the same characteristics of leveraged loans, including their historic indexing to LIBOR.[3]

8. The notes issued by CLOs cover multiple "classes" with different seniorities and payment rights. Typically, there will be three to five classes of secured notes, designated "Class AAA," "Class AA," "Class A," "Class BBB," etc., all of which are secured by the CLO's portfolio of loans and structured to be treated as debt for U.S. tax purposes. The secured notes will provide for a floating interest rate of SOFR (previously LIBOR) plus a margin spread. The more senior the note class, the lower the spread. The lower the note's class, the lower its place in the payment waterfall, the greater its risk of default, the higher its margin spread, and the later its maturity.

9. The CLO will also issue unsecured notes, which are considered equity investments. The equity investors are given a bundle of contractual rights—including a right to most of the CLO's profits—that create an economic ownership interest and ensure the notes are treated as equity for U.S. tax purposes. CLO equity investors such as Defendants and their co-conspirators are a small group of repeat players, with deep expertise in U.S. credit markets.

---

2 *See* Shiloh R. Bates, *An Introduction to CLO Equity*, Flat Rock Global at 9 (May 2022), https://flatrockglobal.com/wp-content/uploads/An-Intro-to-CLO-Equity-May-2022-v5.30.pdf?hsCtaTracking=343fa67c-e5be-4325-8f1a-64648078ba14%7C5d659bdc-9750-437f-89ab-51b46dc5b3a8 [https://perma.cc/U4VA-UCPE].

3 Because second-lien loans are subordinated to leveraged loans, they carry higher margin spreads to account for that extra risk.

10. CLOs are managed by professional asset managers—called CLO managers or collateral managers—appointed by the issuer of the CLO. The CLO manager operates the CLO's investment affairs in return for fees, some of which are tied to the CLO's profitability. These managers often oversee multiple CLOs and typically hold equity positions in the CLOs they manage. The operations of a CLO are supported by a CLO trustee, who performs various back-office tasks, including communications with borrowers, and with CLO debt and equity holders.

**Figure 1. Overview of CLO Structure**




11. CLOs are a margin spread business. After paying certain operating expenses, CLOs try to pay their debt investors less interest than the CLO earns from borrowers whose leveraged loans the CLO holds, allowing the CLO's equity investors to keep the difference as profit.

12. The greater the difference between the interest paid to the CLO by leveraged loan borrowers and the interest paid out to CLO debt holders, the greater the CLO equity investors'

profits. As CLO equity investors sit at the bottom of the CLO payment waterfall, their returns are extremely sensitive to changes in the interest payable on leveraged loans owned by the CLO.

### B. CLO Equity Investors Exercise Significant Control Over CLO Managers and the U.S. Leveraged Loan Market

13. A typical CLO is worth between $500 million and $600 million and holds positions in hundreds of leveraged loans, lending to hundreds of corporate borrowers.

14. Multiple CLOs often lend to the same corporate borrowers under the same leveraged loans simultaneously. Moreover, the largest CLO managers manage many CLOs simultaneously, with the 30 largest CLO managers controlling over 58% of CLO assets under management ("AUM"). Because of the comparatively limited universe of leveraged loans and the concentration of CLO managers, individual CLO managers' portfolios commonly have a 50% overlap with the leveraged loans held by competing CLO managers.

15. CLO equity investors, including Defendants and their co-conspirators, commonly invest across many different CLOs, and work with many of the same CLO managers.

16. Competing equity investors thus have significant cross-holdings of CLOs and, indirectly, leveraged loans. Individual CLOs and their managers thus often share common equity investors and exposure to the same leveraged loans, despite being nominally independent.

17. The equity tranche of a CLO is the riskiest, and therefore most difficult, portion of the CLO capital stack to fund. Without sufficient CLO equity, a CLO cannot meet its overcollateralization test, which requires the CLO to have sufficient assets to meet its liabilities. Additionally, the holders of a majority of a CLO's equity tranche can typically remove the CLO manager for cause and appoint a new manager. They can also direct a redemption after an initial "non-call" period has passed (often two-years after launch) or demand refinancing or repricing of the CLO's notes—all of which can limit the CLO managers' fees and hurt their reputation with

investors. For these reasons, and because there is a small pool of repeat CLO equity investors, CLO managers are dependent on good relations with these investors for existing and future CLOs.

18. These overlapping ownership patterns, combined with CLO equity investors' power over CLO managers, allowed CLO equity investors to direct the market behavior of CLOs: the largest lenders in the U.S. leveraged loan market. As Defendant Eagle Point's principal and portfolio manager Daniel Ko said of Defendants and their co-conspirators, "[I]t's hard for the CLO [managers] to really fight against us [equity investors]."

19. This case concerns CLO equity investors exercising that market power by conspiring to fix leveraged loan borrowers' rates and payments in violation of antitrust law.

### C. The LIBOR-to-SOFR Transition

20. Following various scandals involving LIBOR rate manipulation, the U.K.'s Financial Conduct Authority ("FCA") determined that LIBOR, including USD LIBOR, would be discontinued. In the United States, the Federal Reserve Board and the Federal Reserve Bank of New York established the Alternative Reference Rates Committee ("ARRC"), with a committee of private sector actors, to recommend a replacement benchmark for USD LIBOR. In 2021, the ARRC recommended replacing USD LIBOR with SOFR. The ARRC also recommended that parties to leveraged loans add a credit spread adjustment ("CSA")—additional basis points on top of the margin spread—to the SOFR rate when amending existing USD LIBOR-based loan agreements to account for historical differences between USD LIBOR and SOFR.[4] In loan agreements and securitizations, the CSA (if any) is negotiable between borrower and lender.

[4] ARRC and the subsequently passed LIBOR Act refer to this adjustment as a "tenor-spread adjustment." This Complaint uses "CSA" and "tenor-spread adjustment" interchangeably, as distinguished from the margin spread contained in every leveraged loan agreement that was often unchanged when loan agreements were amended to transition from LIBOR to SOFR.

21. Because contracts govern leveraged loans and second-lien loans, transitioning floating rates from USD LIBOR to SOFR required contractual amendments before USD LIBOR formally ceased publication on June 30, 2023. These amendments should have been subject to market forces that drive the U.S. leveraged loan market: lenders compete by offering borrowers more attractive interest rates and favorable terms, while borrowers compete for capital by accepting higher interest rates or more restrictive terms.

**D. Defendants' Conspiracy to Inflate Interest Rates**

22. Initially, competitive market forces drove borrowers' and lenders' negotiations. Throughout 2022, many corporate borrowers obtained amendments transitioning their leveraged loans from LIBOR to SOFR with no CSAs, or with CSAs lower than the ARRC-recommended levels. Competition drove leveraged loan interest rates (i.e., prices) below the ARRC-recommended levels, which acted as a price ceiling, not a price floor.

23. In January 2023, Defendants halted this competitive process. Defendants and their co-conspirators conspired to ensure that U.S. leveraged loans transitioned from LIBOR to SOFR with the highest possible interest rates. They accomplished this by compelling the CLOs in which they owned equity—the largest leveraged loan lenders in the country—to reject any proposed amendment that failed to adopt the ARRC recommended CSAs.

24. Defendants' conspiracy began with a conference call organized by Defendant Eagle Point. Approximately 70 CLO equity investors attended that call, which spawned a working group among Defendants and their co-conspirators. Defendants and their co-conspirators publicly urged other CLO equity investors to demand that CLO managers reject any leveraged loan amendments not adopting ARRC-recommended CSAs. Defendants and their co-conspirators knew collective action from equity investors and CLO managers could raise rates on transitioning loans. As Eagle Point's Thomas Majewski stated bluntly, "[T]he CLO market is more than 60% of the loan market

– so managers are not alone in this fight . . . Together, the CLO collateral manager universe can ensure loan issuers implement the ARRC's recommended CSAs – so long as we hold the line."[5]

25. Defendants and their co-conspirators worked together to ensure they held the line against loan amendments for less than the ARRC-recommended CSAs, and the conspiracy succeeded. Following the January 2023 Eagle Point conference call, interest rates increased, with a greater share of leveraged loans amended after that date adopting ARRC-recommended CSAs.

26. Defendants and their co-conspirators blocked several prominent borrowers' proposed amendments to transition from LIBOR to SOFR either without any CSA or with a CSA below the ARRC-recommended amount. In January 2023, borrower pet food company WellPet offered a CSA 16 basis points below the ARRC-recommended adjustment, and the working group produced "enough opposition to block this[.]"[6] In early February, reports confirmed that "lenders [] successfully blocked proposed adjustments . . . from sports and news broadcaster Sinclair Broadcast Group, pet food firm Wellness Pet Co., ticket resale company Viagogo Entertainment Inc., and communications equipment business CommScope Inc."[7]

27. Plaintiff's preliminary economic analysis confirms that Defendants' conspiracy worked and significantly raised borrowing costs above competitive levels. That analysis shows that transitioning borrowers paid 47–73 basis points more on a comparative basis than those

---

[5] Thomas Majewski, *Creditflux: Some CLO managers aren't blocking loan amendments with insufficient credit spread adjustments*, EAGLE POINT CREDIT (Feb. 28, 2023), https://www.eaglepointcredit.com/documents/FG/eaglepointcredit/eaglepointcredit/623646_Creditflux_Feb_2023_opinion_CLOs_-_Majewski.pdf [https://perma.cc/5TYL-PJYT].

[6] Dan Ko, *Creditflux: CLO Equity Investors Join Forces to Take On Lowly Loan CSAs*, EAGLE POINT CREDIT (Feb. 2, 2023), https://www.eaglepointcredit.com/documents/FG/eaglepointcredit/eaglepointcredit/622894_2023-02_-_Creditflux_-_CLO_equity_investors_join_forces.pdf [https://perma.cc/8AXB-GMLA].

[7] Shannon D. Harrington, *Credit Markets Are Poised for a Gut Check After 10% Rally*, BLOOMBERG (Feb. 11, 2023), https://www.bloomberg.com/news/articles/2023-02-11/credit-markets-are-poised-for-a-gut-check-after-10-rally [https://perma.cc/AF2D-QTYV].

borrowing money with a new native SOFR loan after Defendants' conspiracy began—a statistically significant result confirmed at the 99% confidence level.

28. CLO equity investors openly discussed their conspiracy. Defendants emphasized the need for CLO equity investors and CLO managers (who commonly held equity positions) to coordinate in ensuring high CSAs, and they celebrated their successes in blocking amendments with lower CSAs. Mike Kurinets, Chief Investment Officer of Capra Ibex Advisors, announced on February 22, 2023, that "CLO equity investors have organized and formed a working group to immediately notify each other of any off-market [i.e., less than the ARRC recommended CSA] loan amendment" and would "notify [their] CLO managers that they expect them to object."[8]

29. Eagle Point's Dan Ko was even more explicit, stating on an April 27, 2023 podcast that: "a bunch of CLO equity investors got together and realized that there wasn't enough focus, and all of these amendments were going through with zero CSA or maybe with 10 basis point CSA. Eagle Point, I organized a call with 70 other equity investors to ensure that the collateral [CLO] managers would focus on this and push back and stop kind of getting bullied by the [borrower's] sponsors [i.e., the private equity firms that owned many leveraged loan borrowers]."[9]

30. When asked how CLO managers responded to the "coordinated push by the equity investor community," Ko confirmed the conspiracy pushed CSAs higher: "the collateral managers [i.e., CLO managers] responding to our push, they know that the equity investors are ultimately the ones that are paying their bills, and I think that we've kind of put them on notice that we're

---

8 Mike Kurinets, *CLO Insider January 2023: What Didn't Change When the Market Rallied*, CAPRA IBEX (Feb. 22, 2023), https://www.capraibex.com/post/clo-insider-january-2023-what-didn-t-change-when-the-market-rallied [https://perma.cc/EX7E-TLH4].

9 THE LAST TRANCHE: *The Last Tranche with Eagle Point's Ko: We haven't made a primary CLO equity investment in nine* months, at 20:54 (Apple Podcast, Apr. 27, 2023), https://podcasts.apple.com/us/podcast/the-last-tranche-with-eagle-points-ko-we-havent/id1494943975?i=1000611034657 [https://perma.cc/QS2B-A52W].

watching."[10] Ko continued, stressing that for CLO managers that did not "push back on [loan amendments with] no CSA or 10 basis points CSA, that could have the, ultimately the effect that a lot of these third-party equity investors [i.e., Defendants and their co-conspirators] don't come back to them to do new issue deals [CLOs] in the future," such that "those [CLO managers] who really don't put up a fight could potentially lose out on future ability to print CLOs."[11]

31. Ko's partner at Eagle Point, Thomas Majewski, also touted the conspiracy and its success, boasting in September 2023 that, after leveraged loans transitioned in 2022 without ARRC-recommended CSAs:

> Eagle Point arranged a call with fellow CLO equity investors in January 2023. The CLO equity investor community voiced our objection to CLO collateral managers allowing non-ARRC spread adjustments on loans. A strong and consistent message from CLO equity investors to CLO collateral managers to not rollover in the face of sponsor and agent bank pressures turned the tide, leading to a substantial majority of leveraged loans transitioning at the ARRC-recommended CSA, in step with CLOs. These outcomes reflect not only the importance of the CLO market to the loan market, but also CLO market participants' ability to collectively and positively affect outcomes for the benefit of all CLOs.[12]

32. Majewski concluded that, "The CLO market has . . . flexed its muscles against aggressive loan agents and [borrower] sponsors."[13] Defendants and their co-conspirators had ensured, as Majewski had demanded, that CLO managers "hold the line" against borrowers.

---

10 *Id.* at 22:06.

11 *Id.* at 22:20.

12 Thomas Majewski, *Creditflux: Market participants smoothed the move from LIBOR to SOFR–but there is more to be done*, EAGLE POINT CREDIT (Sep. 5, 2023), https://www.eaglepointcredit.com/documents/FG/eaglepointcredit/eaglepointcredit/627566_Creditflux_September_2023_comment_-_CLOs_-_Majewski.pdf [https://perma.cc/J4GV-ZUCL].

13 *Id.*

33. It was thus no surprise when Bloomberg reported on July 21, 2025, that the U.S. Department of Justice ("DOJ") had opened a criminal antitrust investigation into Defendants' conspiracy.[14]

34. Defendants' conspiracy reduced competition in the U.S. leveraged loan market, raising Plaintiff's and the Class's interest rates and payments. Plaintiff brings this action on its own behalf and on behalf of those similarly situated to recover the supracompetitive interest they paid because of Defendants' anticompetitive agreement.

## I. PARTIES

### A. Plaintiff

35. Plaintiff CentralSquare (formerly, SuperMoose Borrower, LLC) is a Delaware limited liability company headquartered in Lake Mary, Florida. CentralSquare provides software solutions to over 8,000 public sector agencies across the United States and Canada that assist the delivery of public safety and administrative services.

36. During the class period, Plaintiff CentralSquare borrowed under two leveraged loans containing artificially inflated CSAs. The first leveraged loan, dated August 31, 2018, traded in the public credit market under CUSIP 86845PAC6 ("First-Lien Loan"). The second, also dated August 31, 2018, traded under CUSIP 86845PAE2 ("Second-Lien Loan").

37. The First and Second Lien Loans set their floating interest rates as USD LIBOR plus the applicable margin spread. CentralSquare could elect for its interest payments to be calculated on a one-, three-, or six-month USD LIBOR tenor basis.

---

[14] John Sisco & Carmen Arroyo, *DOJ Probing for Collusion in CLOs During Libor Transition*, BLOOMBERG (July 20, 2025), https://www.bloomberg.com/news/articles/2025-07-20/doj-probing-for-collusion-in-clo-market-during-libor-transition [https://perma.cc/QW9X-7EJ8].

38. CentralSquare amended its First Lien Loan on June 23, 2023, when approximately $910 million remained outstanding. The amendment set the floating interest rate on the First Lien Loan as the sum of: (a) the previously agreed margin spread; and (b) Term SOFR (*see* ¶¶128 below) plus the "Term SOFR Adjustment." The Term SOFR Adjustment, which was the applicable CSA, equaled 0.10% for a one-month Interest Period, 0.15% for a three-month Interest Period, and 0.25% for a six-month Interest Period. CentralSquare elected a three-month Interest Period, setting its interest rate as the agreed margin spread, plus 3-month Term SOFR, plus 0.15%.

39. CentralSquare amended its Second-Lien Loan on June 23, 2023, with the identical CSA. Approximately $380 million remained outstanding at the time. CentralSquare elected a three-month Interest Period under the Second-Lien Loan, setting its interest rate was calculated as the agreed margin spread, plus 3-month Term SOFR, plus 0.15%.

40. Portions of CentralSquare's First-Lien Loan and Second-Lien Loan were owned by various CLOs in 2023. Limited public information shows at least some Defendants held CLOs that owned parts of CentralSquare's First- and Second-Lien Loan. For example, in 2023 Eagle Point Credit Company Inc. held Wind River 2018-1, which held parts of CentralSquare's First- and Second-Lien Loan, and Panagram Structured Asset Management, LLC held OAKC 2021-10A, which held parts CentralSquare's First Lien Loan.

41. CentralSquare paid off its First- and Second-Lien Loans on April 12, 2024, after paying nearly a year of supracompetitive interest due to Defendants' conspiracy.

## B. Defendants

### 1. Eagle Point Defendants

42. Defendant Eagle Point Credit Management LLC ("Eagle Point Management") is a Delaware limited liability company headquartered in Greenwich, Connecticut. It is a registered investment adviser with the U.S. Securities and Exchange Commission ("SEC"). Eagle Point

Management serves as the contractually appointed investment adviser to various funds and managed accounts that own debt and equity in CLOs holding portions of leveraged loans that transitioned from LIBOR-to-SOFR—including loans to Class Members. As investment adviser to these funds and managed accounts, including Eagle Point Credit Company Inc. ("Eagle Point Credit"), and Eagle Point Institutional Income Fund ("Eagle Point Institutional"), Eagle Point Management acts as its clients' agent, managing their investment decisions and external communications, including with CLO managers.[15]

43. Defendant Eagle Point Income Management LLC ("Eagle Point Income Management") is a Delaware limited liability company, headquartered in Greenwich, Connecticut. Eagle Point Income Management is the contractually appointed investment adviser to various funds and managed accounts that own debt and equity in CLOs holding portions of leveraged loans that transitioned from LIBOR-to-SOFR, including loans to Class Members. As investment adviser to these funds and managed accounts, including Eagle Point Income Company Inc. ("Eagle Point Income"), Eagle Point Income Management acts as its clients' agent, managing their investment decisions, and external communications, including with CLO managers.

44. Eagle Point Management and Eagle Point Income Management operate as unified enterprises, sharing the same senior leadership—Thomas Majewski (Managing Partner and Lead Portfolio Manager), Daniel Ko (Portfolio Manager – CLO Equity/Debt), and Daniel Spinner

[15] For example, Eagle Point Institutional reported in April 2022 that under its Investment Advisory Agreement with Eagle Point Management, Eagle Point Management (referred to as the Adviser) "manages the day-to-day operations of, and provides investment advisory and management services to, us." Amongst other matters, Eagle Point Management: "determines the composition of our portfolio, the nature and timing of the changes to our portfolio and the manner of implementing such changes; identifies, evaluates and negotiates the structure of the investments we make (including performing due diligence on our prospective investments); executes, closes, services and monitors the investments we make; determines the securities and other assets that we purchase, retain or sell; and provides us with such other investment advisory, research and related services as we may from time to time reasonably require for the investment of our funds." Eagle Point Institutional Income Fund, Prospectus Supplement (Form 424B3) p. B-15, (Apr. 18, 2022) [https://perma.cc/NE3S-H58S].

(Portfolio Manager – Defensive Income)—as well as staff and office space. Indeed, Eagle Point Management "provides [Eagle Point Income Management] investment professionals and other resources under a personnel and resources agreement."[16] Majewski, Ko, and Spinner manage the day-to-day implementation of both entities' client investment strategies.[17] Both are "ultimately governed through intermediary holding companies by [their] Board of Managers, which governs and oversees the overall activities of [both] investment advisers."

45. When acting as investment advisers, Eagle Point Management and Eagle Point Income Management work collectively and "seek to allocate investment opportunities among [their clients] in a manner that is fair and equitable over time."

46. Defendant Eagle Point Credit Company Inc. ("Eagle Point Credit"), a closed-end management company registered under the Investment Company Act of 1940 (the "1940 Act"), is headquartered in Greenwich, Connecticut, and incorporated in Delaware. Eagle Point Credit contracted with Eagle Point Management as its investment adviser during the relevant periods. Eagle Point Credit's "primary investment objective is to generate high current income . . . by investing primarily in equity and junior debt tranches of collateralized loan obligations." As of March 2023, Eagle Point Credit's investments made it an indirect lender to 1,872 corporate loans, representing 96.2% of all floating rate senior secured loans (i.e., leveraged loans). As of June 30, 2025, Eagle Point Credit held $1.55 billion in total investment assets primarily comprised of CLOs.

47. Defendant Eagle Point Institutional Income Fund ("Eagle Point Institutional") is a Delaware statutory trust registered under the 1940 Act as a non-diversified, closed-end management investment company. It is headquartered in Greenwich, Connecticut. Eagle Point

---

[16] Eagle Point Income Company, Inc., Prospectus (Form 424B1) p. 2, (Dec. 19, 2022) [https://perma.cc/7D9E-B8ZS].

[17] *Id.* at 61.

Institutional contracted with Eagle Point Management to act as its investment adviser during all relevant periods. Eagle Point Institutional' s stated investment strategy is to "generate high current income" by "investing primarily in equity and junior debt tranches of collateralized loan obligations, or 'CLOs.'"[18] Its Corrected Annual Report for 2022 shows $11.9 million in CLO equity holdings through 21 CLOs and 17 CLO managers.

48. Eagle Point Income Company Inc. ("Eagle Point Income") is a closed-end management investment company registered under the 1940 Act, headquartered in Greenwich, Connecticut, and incorporated in Delaware. It contracted with Eagle Point Income Management to act as its investment adviser during all relevant periods. Eagle Point Income invested primarily in "CLO debt tranches rated 'BB'" but also invested "up to 35% of our total assets (at the time of investment) in CLO equity securities."[19] Its Annual Report for 2022 shows approximately $143 million in 15 CLO equity holdings.

49. Eagle Point Institutional's April 2022 Prospectus Supplement reported that, "[a]s of December 31, 2021, [Eagle Point Management], collectively, with Eagle Point Income Management, . . . had approximately $6.9 billion of total assets under management (including undrawn capital commitments) for investment across over 50 funds and managed accounts."[20] The Prospectus further stated, "Based on the Adviser's CLO equity assets under management, the Adviser believes that it is among the largest CLO equity investors in the market." Eagle Point repeated this claim in April 2023. As of September 30, 2025, Eagle Point Management and Eagle Point Income Management collectively managed over $13 billion in assets.

---

[18] Eagle Point Institutional Income Fund, *supra* note 15, at 1.

[19] Eagle Point Income Company Inc., *supra* note 16, at 1.

[20] Eagle Point Institutional Income Fund, *supra* note 15, at 86.

50. Collectively, Eagle Point Management, Eagle Point Income Management, Eagle Point Credit, Eagle Point Institutional, and Eagle Point Income, are referred to as "Eagle Point."

### 2. Capra Ibex Defendants

51. Capra Ibex Advisors, LLC ("CBA") was founded in 2010 as a Delaware limited liability company headquartered in New York, New York. It provided investment advisory services to institutional clients and private investment funds, including CapCol, during the relevant period. As of March 31, 2025, the SEC terminated its registration status.

52. Capra Ibex Credit Opportunities, LLC ("Capra Ibex Credit") is registered with the SEC as a large advisory firm under the laws of Delaware with headquarters in New York, New York. Capra Ibex Credit provides portfolio management and investment consultation services.

53. Capra Credit Management, LLC ("Capra Credit Management") is registered with the SEC as a large advisory firm under the laws of Delaware with headquarters in New York, New York.

54. Collectively, CBA, Capra Ibex Credit, and Capra Credit Management are referred to as "Capra Ibex." Capra Ibex held (or directed its clients to hold) substantial CLO equity investments, including with CLOs that held leveraged loans transitioning from LIBOR to SOFR.

### 3. Fair Oaks Defendants

55. Defendant Fair Oaks Income Limited ("Fair Oaks Income") is a closed-ended investment company registered in Guernsey under the *Companies (Guernsey) Law, 2008* on March 7, 2014, and headquartered in London, United Kingdom. Its registration number is 58123, and it is regulated by the Guernsey Financial Services Commission as a registered closed-ended collective investment scheme. Fair Oaks Income invests through FOIF II LP (the "Master Fund II") and FOMC III LP (the "Master Fund III"), limited partnerships in which Fair Oaks Income is

a limited partner (together, the "Masters Funds"). Fair Oaks Income's 2024 Annual Report states that 92.25% of its net assets were invested in the Masters Funds.

56. Fair Oaks Income invests in U.S., U.K., and European CLOs and other vehicles primarily providing exposure to U.S. and European floating-rate senior secured loans. It primarily invests in CLO equity and mezzanine tranches. As of December 31, 2024, the Master Funds collectively held 15 CLO equity positions and 11 CLO mezzanine positions, with CLO equity positions comprising approximately 84.6% of the portfolio's market value. At that time, the Master Funds held exposure to 1,268 underlying leveraged loan borrowers. As of September 30, 2025, Fair Oaks Income reported approximately $262 million in AUM in CLO equity tranches. On information and belief, Fair Oaks Income invested in CLOs during the Class Period that held loans requiring transition from LIBOR to SOFR.

57. Fair Oaks Capital LLC ("Fair Oaks Capital") is an independent asset management and advisory firm headquartered in London, United Kingdom, and incorporated in Delaware. It also has a principal office in New York, New York. Fair Oaks Capital is an exempt reporting adviser with SEC file number 802-123256. Fair Oaks Capital's website describes itself as "an independent asset management and advisory firm operating from London and New York" and notes in relation to its "[l]eadership team" that "Fair Oaks has a highly experienced team of investment professionals that work from the London and New York offices." During all relevant times, Fair Oaks Capital served as the investment adviser and manager to both Master Funds, providing CLO strategy, analysis, and investment recommendations to each fund's general partner.

58. In practice:

- Fair Oaks Income supplies capital as the primary investor;
- The Master Funds hold the CLO equity and mezzanine tranches; and

- Fair Oaks Capital develops, recommends, and implements the CLO investment strategy.

59. Fair Oaks Income describes itself as an investor in U.S. and European CLOs, emphasizing its "active involvement in deal origination" and ability to "exercise control rights as an independent investor." Fair Oaks Income does not passively hold CLO equity positions but actively influences the terms, administration, and economic outcomes of its CLO investments.

60. Together, Fair Oaks Income, Fair Oaks Capital, and the Master Funds form an integrated CLO investment enterprise that shall be referred to as "Fair Oaks." Through this coordinated structure, Fair Oaks deploys and manages a unified CLO strategy across multiple legal entities while operating as a single CLO-focused investor.

**4. Livermore Defendant**

61. Defendant Livermore Investments Group Limited ("Livermore") is an investment company incorporated under the laws of the British Virgin Islands with its registered office in Tortola, British Virgin Islands. Livermore describes itself as a specialized investor in the U.S. CLO market, focusing primarily on equity and mezzanine tranches. Its 2024 Annual Report described its portfolio as being "geographically focused on the US." On information and belief, during the relevant period, Livermore held (or directed its clients to hold) substantial investments in CLOs, including CLOs holding leveraged loans transitioning from LIBOR to SOFR.

**5. Eldridge Defendants**

62. Defendant Eldridge Industries, LLC ("Eldridge Industries"), is an asset management and insurance holding company headquartered in Miami, Florida, and incorporated in Delaware. Eldridge Industries spun out part of its structured credit team in 2021 to launch Panagram Structured Asset Management, LLC ("Panagram Management"), which would focus on CLO investment.

63. Panagram Management served as investment advisor and manager of Panagram Capital, LLC ("Panagram Capital"). Both Panagram Management and Panagram Capital are wholly owned subsidiaries of Eldridge Industries. In 2025, Panagram Management was renamed Eldridge Structured Credit Advisers, LLC ("Eldridge Advisers"). It is a Delaware company, headquartered in New York, New York.

64. Panagram Capital is a closed-end management investment company registered in Delaware under the 1940 Act and headquartered in New York, New York. Panagram Capital invested primarily in equity tranches of CLOs.

65. In 2024, the Panagram Management advisory platform was rebranded to Eldridge Advisors, absorbing the Panagram branding into its parent corporation. Two Panagram-branded funds—Panagram AAA CLO ETC and Panagram BBB-B CLO ETF—were rebranded to Eldridge AAA CLO ETF (CLOX) and Eldridge BBB-B CLO ETF (CLOZ), effective January 1, 2025.

66. Eldridge manages over $70 billion in assets. As of July 31, 2023, Panagram Management (now Eldridge Advisers) managed $14.2 billion in CLO securities investments, asset-backed securities, and related investments. As of November 30, 2022, Panagram Management had $1.4 billion in CLO equity AUM. At that time, Panagram Management "comprise[d] members of an internal structured credit team from Eldridge that has worked together under the leadership of John E. Kim" who was promoted to Principal of Eldridge in February of 2020.

67. Taken together, Eldridge Industries and its affiliated entities, including Panagram Structured Asset Management, LLC (later renamed Eldridge Structured Credit Advisers, LLC), Panagram Capital, LLC, CLOX, and CLOZ (collectively, "Eldridge"), are in practice, a single integrated enterprise. Eldridge serves as the ultimate parent of each entity. Functionally, these entities did not act as independent market participants, but rather they operated as components of

one Eldridge-controlled CLO investment organization. On information and belief, during the relevant period, Eldridge held (or directed its clients to hold) substantial investments in CLOs, including CLOs holding leveraged loans transitioning from LIBOR to SOFR.

**6. Pearl Diver Defendants**

68. Defendant Pearl Diver Credit Company Inc. ("Pearl Diver Credit") is a closed-end management investment company registered under the 1940 Act. Pearl Diver Credit principal executive office is in New York, New York, and it is incorporated in Delaware.

69. Pearl Diver Credit invests "primarily in third-party CLO equity and mezzanine tranches of predominantly U.S.-dollar denominated CLOs backed by corporate leveraged loans issued primarily to U.S. obligors." As of June 30, 2025, Pearl Diver Credit had a total of $162M invested in equity tranche CLOs. At that time, Pearl Diver Credit's portfolio held 52 CLO positions managed by 31 CLO managers and held exposure to 1,800 loan issuers.

70. Pearl Diver Credit is advised by Defendant Pearl Diver Capital LLP ("Pearl Diver Capital").

71. Defendant Pearl Diver Capital is a limited liability partnership organized under the laws of England and Wales and is headquartered in London, United Kingdom, with an office in New York, New York. It is an SEC-registered investment adviser and provides investment management services to clients other than Pearl Diver Credit. Pearl Diver Capital's Investment Adviser Public Disclosure filings confirm that it maintains an office in New York, New York, from which its employees conducted its investment advisory business. As of August 31, 2025, Pearl Diver Capital had approximately $3.0 billion of total AUM, primarily deployed in CLOs.

72. Pearl Diver Credit, Pearl Diver Capital, and the other entities Pearl Diver Capital advises as a unified entity. Both entities share identical officers, partners, managing and executive directors, and vice presidents, as well as nearly identical lower-level personnel.

73. Pearl Diver Credit acknowledges "taking an activist role and engaging with CLO managers regarding financings of CLO liabilities." Pearl Diver Capital's 2024 Annual Report noted that it "has developed close relationships with over 80 CLO managers . . . across the CLO spectrum, enabling the firm to have rare access to critical credit information on underlying companies in CLO portfolios." Similar language is reused in Pearl Diver Credit's subsequent investor reports until its June 2025 semi-annual report, around the time Bloomberg reported on the DOJ's investigation, where the language is conspicuously absent.

74. Together, Pearl Diver Credit and Pearl Diver Credit are referred to as "Pearl Diver." On information and belief, during the relevant period, Pearl Driver held (or directed its clients to hold) substantial investments in CLOs, including CLOs holding leveraged loans transitioning from LIBOR to SOFR.

**7. John Doe Defendants**

75. Defendants John Doe CLO Equity Investors 1–99 represent currently unknown investors that participated in Defendants' LIBOR-to-SOFR working groups and colluded to include or raise the CSAs of leveraged loans transitioning from LIBOR to SOFR.

**8. References to Defendants**

76. As used herein, "Defendants" refers to and includes each named Defendant's predecessors, successors, parents, wholly owned or controlled subsidiaries or affiliates, employees, officers, and directors.

77. Whenever this Complaint references any act, deed, or transaction of any corporation or partnership, that allegation means the corporation or partnership engaged in the act, deed, or transaction through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

### 9. Agents, Affiliates, and Co-Conspirators

78. Various persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts or made statements in furtherance of the conspiracy. Each named Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not named as Defendants in this Complaint.

## II. JURISDICTION AND VENUE

79. This action arises under Section 1 of the Sherman Antitrust Act of 1890 ("Sherman Act") (15 U.S.C. §1) and Sections 4, 7, and 16 of the Clayton Antitrust Act of 1914 ("Clayton Act") (15 U.S.C. §§15, 18, 26). The action is for compensatory damages, treble damages, costs of suit, reasonable attorneys' fees, and any other relief as may be just and proper.

80. This Court has federal question subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), 1337, 1367 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26).

81. Venue is proper in this District under 15 U.S.C. §§15 and 22 and 28 U.S.C. §1391(b), (c), and (d). At all times relevant to the Complaint: (a) Defendants resided, transacted business, were found, or maintained agents in the United States, including in this District; (b) a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

a. Eagle Point is domiciled in this District;

b. Defendants engaged in conduct in this District in furtherance of the conspiracy to profit from the violations of law alleged herein, including the

January 2023 conference call organized by Eagle Point to establish the conspiracy (*see* ¶145); and

c. Defendants participated in a working group organized by Eagle Point from this District (*see* ¶186).

82. A substantial portion of the conduct alleged herein affected interstate trade and commerce, including in this District.

83. Defendants' conduct occurred within the flow of interstate commerce and was intended to, and did, substantially affect the interstate commerce of the United States.

## III. LEVERAGED LOANS AND CLOS

### A. An Overview of the U.S. Leveraged Loan Market

84. This case concerns secured non-investment grade loans to U.S. companies with credit ratings below BBB- (by S&P and Fitch) or below Baa3 (by Moody's). Where those loans are senior, they are commonly referred to as "leveraged" loans, as distinguished from "investment grade" loans to U.S. companies with higher credit ratings.[21] The term "leveraged loans" reflects that borrowers typically have a high leverage ratio that is substantial debt relative to their EBITDA (earnings before interest, taxes, depreciation, and amortization), equity, or assets—not that the loans themselves contain embedded leverage.

85. Non-investment grade companies constitute most rated U.S. companies. U.S. leveraged loan borrowers include tool maker Harbor Freight, education company McGraw-Hill, hotelier Hilton, and ticketing company Live Nation.

[21] Where the loans are subordinated to other leveraged loans, they are common referred to as "second-lien loans" or "subordinated loans." Those second-lien loans that were indexed to USD Libor and transitioned to SOFR via an amendment after January 1, 2023, were also impacted by the conspiracy.

86. Borrowers use leveraged loans to finance corporate activities, including mergers and acquisitions, stock repurchases, dividend payments, leveraged buyouts, and new projects. When borrowers seek leveraged loans, they can also establish a revolving credit facility, which functions like a credit card. The revolver is distinct from the term loan component, which is drawn upon closing and repaid at maturity. The borrower may also establish a delayed draw term facility, which permits them to access pre-approved sums at certain stages over a set period, rather than all at once at closing, potentially reducing the borrower's debt servicing costs.

87. The term loan component of a leveraged loan, or portions thereof (sometimes called "commitments" or "participations"), more often trades on secondary markets after origination.[22]

88. Public debt markets offer borrowers important advantages over the private loan market. Functioning properly, public credit markets create deeper pools of capital by attracting diverse investors seeking returns on corporate debt. This expanded investor base gives companies more financing options. Public markets also help establish fair pricing through competitive dynamics. The transparency and active trading characteristics of public credit markets typically enable borrowers to secure lower interest rates than they would pay in private loan transactions.

89. Leveraged loans are typically governed by credit agreements and pay floating interest rates to protect lenders against adverse changes in interest rates (i.e., protects them against market risk). Traditionally, this involved selecting a USD LIBOR tenor (e.g., 1-month or 3-month) and negotiating an additional margin to accord for the borrower's creditworthiness. The spread is often 300-600 basis points given the comparatively low creditworthiness of most leveraged loan borrowers. Today, SOFR is the primary floating rate used to set the base rate in leveraged loans

---

[22] These loans are assigned CUSIP numbers by the Committee of Uniform Security Identification Procedures, which are unique identification numbers that facilitate secondary-market trading by clearly identifying the loan being offered for trading. By contrast, private loans are not typically assigned a CUSIP number.

in the U.S. In both cases, the calculation of the interest rate and schedule of payments set out in the credit agreement determines the interest earned by lenders under the loan agreement.

90. The interest rate set by the credit agreement is a key aspect of the loan's market value to lenders and potential second market purchasers. A second key factor is credit risk—the risk that the borrower cannot or will not meet its obligations, including non-payment.

91. Lenders can protect against credit risk by requiring covenants in credit agreements, including those that limit borrowers' business activities. While covenants reduce a lender's risk exposure, they also constrain the borrower's business flexibility and ability to return capital to shareholders in the form of dividends. Loans with restrictive covenants are therefore less appealing to borrowers. This creates a direct trade-off: borrowers typically pay higher interest rates to obtain greater operational flexibility, while lenders may accept lower interest rates in exchange for stricter covenants and reduced risk.

92. These factors drive competitive dynamics in the U.S. leveraged loan market. When the market operates properly, lenders compete to finance borrowers by offering attractive terms—lower interest rates or fewer restrictive covenants. Borrowers compete for available capital by accepting higher interest rates or more restrictive covenants.

**B. Syndication and Securitization of Leveraged Loan Lifecycle**

93. Historically, corporate lending was straightforward: a bank made a loan to a company, kept that loan in its portfolio, collected interest payments over time, and received principal repayment upon maturity. This approach had significant limitations—it concentrated all default risk with a single lender and raised borrowing and transaction costs for borrowers needing more funds than one bank was willing to lend. Banks were therefore hesitant to lend to unfamiliar borrowers or companies requiring substantial capital or presenting elevated credit risk, leaving borrowers without sufficient funds, or forcing them to seek multiple loans.

94. Beginning in the 1980s, the U.S. leveraged lending market evolved through two key innovations: syndication and securitization. With a syndicated loan, multiple lenders pool their money to finance a single borrower, spreading credit risk across lenders (the "syndicate"). Securitization works on a similar principle of risk diversification: lenders package multiple loan participations together into securities, including CLOs, spreading the risk across multiple investors who in return gain exposure to multiple borrowers. Both syndication and securitization achieve the same fundamental goal: spreading the risk of individual loans across numerous lenders, dramatically expanding the pool of available lenders—and thus capital—for corporate borrowers.

95. Today, leveraged loans are commonly arranged by a lead investment or commercial bank (the "arranger," "lead bank," or "agent bank") and typically range from several hundred million to several billion dollars. Because these loans are so large, they are typically broken into smaller portions that are funded or bought by other lenders as part of the syndication and securitization process. These loans, governed by a single credit agreement commonly negotiated between the borrower and the arranger (acting on behalf of all lenders), result in the borrower effectively having many lenders. The lenders who purchase a portion of the loan after origination commonly interface with the borrower through the agent bank.

96. CLOs participate in loan syndicates and buy and sell portions of leveraged loans in the secondary market, as do many borrowers themselves. Companies often repurchase their own debt on the secondary market for less than face value, effectively retiring their loan at a discount.

97. Borrowers and lenders can modify loans through amendments. Borrowers and lenders amend existing loan terms for various business reasons: to provide relief from restrictive covenants, to permit asset sales or dividend payments to shareholders, or to address terms that no longer function (as with the LIBOR-to-SOFR amendments).

98. A borrower can also close out an existing leveraged loan by early repayment of the principal. A common means of doing this is a refinancing. In a refinancing, a borrower pays off existing debt by taking on a new loan with (ideally) more favorable terms.

99. These refinancings and amendments represent a normal, market-driven aspect of lender-borrower relationships within the U.S. leveraged loan market. Prevailing market conditions directly influence what terms both parties are willing to accept in any amendment, with lenders competing to provide borrowers favorable modification terms to secure their continued business.

**C. CLOs Dominate the U.S. Leveraged Loan Market**

100. CLOs are the largest lenders in the $1.4 trillion U.S. leveraged loan market, owning approximately 64% of all U.S. leveraged loans by value. Without CLOs, the U.S. leveraged loan market would be significantly less liquid, as many capital providers (e.g., certain institutional investors such as insurance companies and pension funds) have bylaws preventing them from investing in non-investment grade debt or all but the highest rated non-investment grade debt. In 2024, CLOs funded 61% of all newly issued U.S. leveraged loans by value.

101. Each issuer of a CLO is a separate legal entity or trust. At its inception, the sponsor of the CLO, typically an investment bank, appoints a CLO manager to act as the CLO's agent and manage its investment decisions and front-office activities. The CLO's back-office operations and administration is typically provided by a licensed bank acting as the CLO trustee.

102. Some leveraged loan assets are purchased before the CLO's notes are issued during what is known as "the warehouse period." During the warehousing period, CLO equity investors often have multiple discussions with the CLO manager about leveraged loan selection to ensure that they meet their desired makeup and parameters for the CLO. At closing, the CLO issues the notes (debt) to its investors, and the proceeds are simultaneously used to repay the warehouse loan.

103. For example, assume that a CLO is being issued in the amount of $500 million. This means that $550 worth of leveraged loans will need to be acquired assuming that the over collateralization requirement is 10%. Further assume that $450 million worth of leveraged loans were purchased during the warehouse period. Hence, an additional $100 million worth of leveraged loans will need to be purchased during the ramp up period following the close.

104. At the closing, the CLO issues $500 million in notes (debt), $450 million of which is used to pay off the warehouse loan used by the CLO to fund the initial purchase of leveraged loans. Of the $500 million in notes, $400 million may be secured AAA, AA, or A-rated debt at coupon rates (interest rates) between 1.65% and 3%, and $50 million may be secured BBB, BB, or B-rated debt at coupon rates between 4% and 8%. These notes are secured against the CLO's pool of leveraged loans. The remaining $50 million comprises the equity, which is unsecured.

105. Principal and interest payment generated by the leveraged loan pool are paid to noteholders and equity holders according to "waterfall" instructions that govern the CLO. After certain fees are paid (e.g., trustee fees, and the CLO manager's senior management fee), payments begin with the senior-most debt holders (e.g., AAA, then AA, then A, etc.), followed by lower-rate debt tranches, in order of seniority. Any remaining funds flow to equity holders whose right to receive payment is junior to both secured noteholders and the CLO's remaining costs (e.g., the CLO manager's subordinated fees and, if certain conditions are met, an incentive fee).

106. CLOs are structured to pay the holders of its secured notes less interest than the CLO receives from the leveraged loans purchased by the CLO. Therefore, when a CLO is performing well, it permits the equity holders to keep this rate spread as a return on equity (profit).

107. As one analyst explained:

> Buying the equity in a CLO is like buying the stock of a bank, where the CLO/bank acquires a portfolio of loans that pay an interest rate (perhaps 5% or so), using funds

that include (1) its own equity capital, and (2) money borrowed from investors (in the case of a CLO), or taken as deposits (in the case of a bank). The key to making money, for both banks and CLOs, is (1) to have as big a spread as possible between the interest rate you collect on your loan portfolio, and the rate you pay on your bank deposits or CLO borrowings, and (2) to leverage that borrowing as much as you prudently can, so you can collect the spread multiple times.[23]

108. The CLO's equity holders (who sit at the bottom of the CLO's balance sheet) are the first to absorb losses from borrowers who default (and fail to pay the CLO at all), or, critically for this case, reduced profits flowing from borrowers who negotiate lower interest rates on loans held by the CLO (and pay the CLO less).

109. This is deliberate. The bundle of economic rights given to equity holders ensure those investments are treated as equity for U.S. tax purposes, and not debt. Among other matters, a majority (or at times, supermajority) of the CLO equity holders can cause the CLO to redeem the secured notes, effect a refinancing or re-pricing of the notes, issue additional securities, declare a tax event, remove a CLO manager for cause, and appoint a new CLO manager.[24]

110. Importantly, CLO managers commonly have an equity stake in the CLOs they manage, further aligning the managers' interests with those of other CLO equity holders.

111. CLO managers can receive three forms of management fees: (a) a fixed fee, often 10 to 25 basis points of the value of the assets held by the CLO, paid at the top of the waterfall; (b) a second fixed fee, often 25 to 30 basis points, that is paid after expenses and distributions to CLO debt but before equity (commonly called the junior or subordinated fee); and (c) at times, an incentive fee, paid only if the rate of return of the CLO's loan portfolio meets a certain threshold,

---

[23] Steven Bavaria, *CLOs: The Basics*, SEEKING ALPHA (Jan. 20, 2021), https://seekingalpha.com/article/4399934-clos-the-basics [https://perma.cc/US3X-BTC3].

[24] While CLO equity holders cannot vote for directors of the CLO, this has little effect in practice, as directors do not make any decisions which impact the CLO's economic affairs.

or "hurdle," level (often 12%). The subordinated and incentive fees commonly comprise a majority of manager compensation.

### D. Defendants and the Co-Conspirators Exercise Market Power Through Cross-Ownership of CLOs

112. CLO portfolios are diversified by design to reduce concentration risk in the asset portfolio. A typical CLO owns portions of more than 200 leveraged loans. As there are typically around only 1,500 leveraged loans outstanding at any given point, multiple CLOs often lend to the same corporate borrowers under the same leveraged loans simultaneously. Indeed, industry analyst 9fin looked at the overlap among the top 20 U.S. CLO managers' portfolios for CLOs issued in 2023 – 2024 and found the average common borrower overlap to be between 46% and 52%.[25] Put differently, on average, 46-52% of a given CLO manager's portfolio consisted of loans from of the same borrowers held by the other top 20 U.S. CLO managers.

113. Leading CLO managers manage multiple CLOs simultaneously. A single CLO manager may manage numerous CLOs that own different, but often overlapping, leveraged loans.

114. In 2023 (and today), a relatively small group of CLO managers controlled a large portion of the U.S. CLO market. Firms such as Carlyle, Blackstone, PGIM, CIFC, and Sound Point each manage dozens of CLOs that own U.S. leveraged loans:

**Table 1. Number of U.S. Focused CLOs Managed by Leading CLO Managers as of March 2024 and Their AUM[26]**

| CLO Manager | Number of U.S. CLOs Managed as of March 2024 (and their total AUM) |
|---|---|
| Carlyle | 68 ($37.64bn) |

25 Claire DeSilva & Sam Robinson, *US CLO portfolio overlap — Managers get CLOser, but more diverse*, 9FIN (Dec. 2, 2025), https://9fin.com/insights/us-clo-portolio-diverse [https://perma.cc/T5L8-CCTC].

26 The number and value of the CLOs owned by these CLO managers were roughly similar in 2023. *See, e.g.*, *League Table: US CLO Manager AUM (as of 30 September 2023)*, CLO RSCH. (Oct. 13, 2023),

| **CLO Manager** | **Number of U.S. CLOs Managed as of March 2024 (and their total AUM)** |
|---|---|
| Blackstone | 65 ($34.35bn) |
| Sound Point | 58 ($27.86bn) |
| CIFC | 56 ($29.46bn) |
| PGIM | 54 ($26.73bn) |
| Octagon | 52 ($27.42bn) |
| Ares (Ivy Hill) | 49 ($25.77bn) |
| CSAM | 44 ($29.58bn) |
| KKR | 42 ($19.02bn) |
| Benefit Street (Alcentra) | 41 ($18.05bn) |
| Neuberger Berman | 39 ($20.23bn) |
| Anchorage | 39 ($17.32bn) |
| Bain | 35 ($16.78bn) |
| Palmer Square | 32 ($16.20bn) |
| Barings | 32 ($13.69bn) |
| CVC | 31 ($15.82bn) |
| Redding Ridge (Apollo + MidCap) | 29 ($18.40bn) |
| Investcorp | 29 ($12.47bn) |
| BlackRock | 27 ($13.45bn) |
| Golub | 24 ($11.15bn) |

https://clopremium.co.uk/league-table-us-clo-manager-aum-as-of-30-september-2023/ [https://perma.cc/H6U3-S6GB].

115. Managing dozens of CLOs gives these managers influence over a substantial portion of leveraged loans. For example, in 2023, Carlyle, one of the world's largest CLO managers, managed more than $51 billion in global CLO AUM. Throughout 2023, Carlyle raised $2.2 billion in new AUM by establishing five new CLOs. Blackstone Inc., another large CLO manager, manages roughly $51 billion in global CLO AUM.

116. The leading CLO managers control the bulk of leveraged loans held by CLOs. In September 2025, the 30 largest CLO managers by AUM represented around 58.4% of the total global CLO AUM. The U.S. accounts for nearly 78% of the $1.5 trillion global CLO market. If these top 30 CLO manages own approximately 58.4% of U.S. CLO assets (i.e., portions of leveraged loans) and CLOs own 64% of U.S. leveraged loans by value, these top 30 CLO managers control CLOs owning approximately 37% of U.S. leveraged loans by value.

117. CLO equity investors commonly invest in multiple CLOs operated by numerous CLO managers. Consequently, a single CLO equity investor can lend to most borrowers in the U.S. leveraged loan market. Conversely, individual CLOs and their managers, though nominally independent, often share common equity investors and exposure to the same leveraged loans. As noted above, CLO managers depend upon the continued support of CLO equity investors to operate their existing CLOs and launch new CLOs, and are often CLO equity investors themselves.

118. Through their extensive ownership of CLO equity across numerous CLOs, Defendants and their co-conspirators control the most powerful lenders in the U.S. leveraged loan lending system. While publicly available data regarding holdings is scarce, the data that is available shows Defendants held equity positions in a substantial number of CLOs.

119. The available public information shows that Defendants and their co-conspirators also held significant equity positions in CLOs managed by the largest CLO managers:

**Table 2. Eagle Point, Eldridge, and Pearl Diver's Publicly Disclosed Investments in CLOs Managed by Major CLO Managers Across 2023-2025**[27]

| CLO Manager | Eagle Point | Eldridge | Pearl Diver |
|---|---|---|---|
| Carlyle | ✓ | ✓ | |
| Blackstone | ✓ | ✓ | ✓ |
| CIFC | ✓ | ✓ | ✓ |
| Ares (Ivy Hill) | ✓ | ✓ | ✓ |
| CSAM | ✓ | ✓ | |
| KKR | ✓ | ✓ | |
| Benefit Street (Alcentra) | ✓ | ✓ | ✓ |
| Neuberger Berman | ✓ | ✓ | |
| Anchorage | ✓ | | ✓ |
| Bain | ✓ | ✓ | ✓ |
| Palmer Square | ✓ | ✓ | |
| Owl Creek Asset Management / Blue Owl Credit | ✓ | ✓ | ✓ |
| Apollo Credit | ✓ | ✓ | ✓ |
| Signal Peak Capital Management | ✓ | | ✓ |
| Flatiron Partners | ✓ | ✓ | |
| Onex | ✓ | ✓ | ✓ |
| Regatta | ✓ | ✓ | ✓ |
| Rockford Tower | ✓ | ✓ | ✓ |

27 Plaintiff was unable to find public holdings of specific CLOs for Capra Ibex, Fair Oaks, and Livermore.

120. This cross-ownership and cross-management structure of CLOs, and thus U.S. leveraged loans, combined with CLO equity holders' control over CLO managers and position at the bottom of the CLO waterfall, provided Defendants and their co-conspirators with the ability to influence outcomes of leveraged loan modifications across the market. Because Defendants' and their co-conspirators' CLO equity interests span a wide array of CLOs, with each holding overlapping loans in their respective portfolios, an increase in the rate paid by a particular borrower benefited Defendants and their co-conspirators across their entire CLO equity portfolios.

121. Moreover, Defendants and their co-conspirators are active investors who interact regularly with CLO managers and, in many cases, represent a meaningful portion of a particular manager's equity investors across multiple CLOs. This allowed Defendants and their co-conspirators to exert pressure on CLO managers—themselves commonly equity investors—to act in unison on borrower amendments, including by threatening to withhold future equity investment, replace managers, or otherwise affect managers' economic prospects.

122. With their market power, Defendants and their co-conspirators aligned the conduct of nominally independent CLO managers through these mechanisms, causing them to act collectively rather than competitively when responding to borrower-proposed LIBOR-to-SOFR amendments that sought lower CSAs than those recommended by the ARRC.

123. With this description of how CLO equity investors exercise an outsized influence in the leveraged loan market, we address the regulatory change that created the opportunity for Defendants' conspiracy: the market's transition from LIBOR to SOFR.

## IV. LEVERAGED LOAN MARKETS TRANSITION FROM LIBOR TO SOFR

### A. LIBOR's Demise Following Manipulation Scandal

124. LIBOR was designed to represent the average rate at which major banks could borrow from each other, calculated daily based on submissions from a panel of banks who reported

their estimated borrowing costs. Throughout the early 2000s, traders at various banks colluded with rate submitters to push LIBOR up or down to benefit their own derivative positions. This extensive manipulation by many of the world's largest banks destroyed LIBOR's credibility as an accurate measure of borrowing costs.

125. Authorities responded with reforms, passing new regulations that criminalized benchmark manipulation and overhauling submission procedures with enhanced surveillance. Most significantly, financial markets transitioned away from LIBOR, with most LIBOR settings ceasing by December 2021, and the remaining USD LIBOR settings ending on June 30, 2023.[28]

### B. The Federal Reserve Establishes ARRC to Recommend a LIBOR Replacement for LIBOR-Based Loan Agreements

126. In 2014, the Federal Reserve Board and the Federal Reserve Bank of New York established the Alternative Reference Rates Committee (ARRC), a group of private sector participants, to recommend a new benchmark to replace LIBOR.

127. In 2017, ARRC identified SOFR as the rate representing best practice for use in certain financial instruments that previously used overnight or term USD LIBOR rates,[29] including the loans at issue in this case.

128. SOFR is a benchmark representing an overnight interest rate for U.S. dollar-denominated, repurchase agreements backed by U.S. Treasury securities. The Chicago Mercantile Exchange ("CME") publishes Term SOFR for one-, three-, six-, and 12-month tenors, calculated using CME SOFR futures trading activity. ARRC endorsed the use of Term SOFR as a replacement for USD LIBOR for these tenors in 2021 and 2022.

---

28 A synthetic version of USD LIBOR based on SOFR subsequently continued until September 2024.

29 Term rates include one-, three-, six-, and 12-month LIBOR rates.

129. Because SOFR is based on the observable rate financial institutions pay each other to borrow cash overnight in transactions collateralized by Treasury securities or futures contracts, it is less prone to manipulation than LIBOR.

130. In March 2021, ARRC established recommended fixed tenor-spread adjustments—commonly called credit spread adjustments, or "CSAs"—to be applied to LIBOR-based loans converted to SOFR. Historically, SOFR rates were lower than equivalent LIBOR rates (e.g., one-month SOFR historically was lower than one-month USD LIBOR), so ARRC recommended adding CSAs when converting a contract from LIBOR to SOFR (i.e., SOFR plus a spread).

### C. The LIBOR Act and Its Limited Application to Leveraged Loans

131. In March 2022, Congress largely adopted ARRC's recommendations in the Adjustable Interest Rate (LIBOR) Act of 2021 ("LIBOR Act"), which would automatically transition certain agreements from LIBOR to SOFR after June 30, 2023, and apply the ARRC recommended tenor spreads.

132. The LIBOR Act explicitly excluded LIBOR-based leveraged loan agreements that: (a) had a pre-existing non-LIBOR-based alternative interest rate; (b) gave a "determining person" authority to select an alternative benchmark (so long as the determining person did so); or (c) were amended to adopt a non-LIBOR rate on or before June 30, 2023.[30]

133. Even before market participants added clauses to loan agreements explicitly facilitating the LIBOR-to-SOFR transition, many leveraged loans contained provisions permitting borrowers to convert their LIBOR-based loan to an alternative rate loan, known as an Alternative Base Rate ("ABR") loan, and mandating such conversion should the LIBOR rate become unusable.

[30] 12 U.S.C. §§5801(b)(3), 5803(a).

ABR loan interest rates were commonly calculated by reference to Wall Street Journal ("WSJ") Prime, which typically printed higher than either LIBOR or SOFR.

134. Because market participants regarded the ABR interest rate as a fail-safe provision, borrowers and lenders remained incentivized to amend their credit agreements to replace the standard LIBOR term loan interest rate provisions with SOFR equivalents.

## V. DEFENDANTS CONSPIRED TO INFLATE LEVERAGED LOAN INTEREST RATES

### A. Pre-January 2023: A Competitive Market Forces Loan Prices Below ARRC Recommendations

135. At the beginning of 2022, U.S. regulators banned new loans from using LIBOR but gave existing LIBOR-based leveraged loans until June 30, 2023, to move to SOFR.

136. Throughout 2022, leveraged loan borrowers began either refinancing those loans to new SOFR-indexed loans or proposing amendments to their existing loans to transition from LIBOR to SOFR. During this period, many leveraged loan borrowers successfully proposed transitions with no tenor-spread adjustment or an adjustment lower than the applicable ARRC-recommended adjustment.[31] For example:

a. **Infoblox:** The internet device management hardware and software provider amended its $1.29 billion first-lien and $455 million second-lien term LIBOR loans to SOFR loans with no CSAs in August 2022.

b. **PowerSchool:** The education technology platform company amended its $775 million first-lien term LIBOR loan to a SOFR loan with no CSA in September 2022.

[31] *Id. See* Section V(C) below for analysis of average CSAs before and after Defendants' conspiracy.

c. **Element Solutions:** The specialty chemicals manufacturer amended its $1.1 billion term LIBOR loan to a SOFR loan with no CSA in October 2022.

d. **Inmarsat:** The satellite network company amended its $1.75 billion term LIBOR loan to a SOFR loan with no CSA in November 2022.

e. **Covanta:** The waste-to-energy provider amended its $1.435 billion term loan from three-month LIBOR to three-month SOFR with no CSA in November 2022.

f. **Mister Car Wash, Inc.:** The car wash chain amended its $900 million term LIBOR loan to a SOFR loan with only a 10-basis point CSA in December 2022. Mister Car Wash, Inc.'s CFO, Jed Gould, highlighted the competitive aspect of the amendment process: "Anytime you're negotiating with [loan] investors, they would like more spread [but] [a]s a corporate issuer, we want that spread to be as little as possible."[32]

137. The market priced the interest rate for these LIBOR-based leveraged loans lower than the ARRC tenor-spread adjustment recommendations. As Bradley Rogoff, head of fixed income, commodities and currency research at Barclays said at the beginning of January 2023, "What is suggested by the ARRC is more than what the market has really gravitated around."[33]

138. The market's pricing of leveraged loans below ARRC's March 2021 recommendations reflected competitive forces at work and changing economic circumstances. The Federal Reserve had significantly raised rates since ARRC issued its recommendations,

[32] Mark Maurer, *Companies, Lenders Clash Over Loan Spreads in Switch From Libor*, WALL ST. J. (Jan. 13, 2023), https://www.wsj.com/articles/companies-lenders-clash-over-loan-spreads-in-switch-from-libor-11673570660 [https://perma.cc/WXF7-CU7T].

[33] *Id.*

leaving leveraged loan borrowers—whose loans have floating rates—with higher interest payments on their large debt burdens. Moreover, the spread between LIBOR and SOFR, the key justification for ARRC-recommended CSAs, had significantly narrowed. Between March 2021 and June 2023, the spread between one-month USD LIBOR and one-month Term SOFR averaged approximately five basis points, far below the 11.45 basis points spread recommended by ARRC for Term Loans using one-month interest periods. That average spread between one-month USD LIBOR and one-month Term SOFR had been steadily declining, running at 5.5 basis points during March–December 2021, 5.2 basis points across 2022, and 2.8 basis points from January-June 2023.

**Figure 2. Spread Between One-Month USD LIBOR and One-Month Term SOFR**




139. Leveraged loan lenders such as CLOs, whose managers are in the business of running multiple CLOs, felt pressured to stay in their borrowers' good graces to maintain access to future leveraged loan offerings, as Eagle Point's Dan Ko observed (See V(B) below). Moreover, as private equity firms (commonly referred to as "sponsors") owned many U.S. corporations with

active leveraged loan and other financing needs, lenders—including CLOs (and their managers)—were doubly incentivized to accommodate borrower amendment requests to ensure access to the next allocation when those private equity firms returned to the market with another loan deal. Consequently, leveraged loan lenders, including CLOs, accommodated borrowers' efforts to lower their interest rate burden through LIBOR-to-SOFR amendments throughout 2022.

140. As 2022 closed, Defendants and their co-conspirators became alarmed by market forces driving leveraged loan interest rates lower. As equity investors and CLO managers sit at the bottom of the CLO payment waterfall, any reduction in interest payments harms their returns. The potential shortfall was exacerbated by many CLOs having shifted their LIBOR indexed debt agreements with their secured noteholders to SOFR loans with ARRC-recommended CSAs. As Eagle Point's Dan Ko explained, "You're paying 26 [bps] out to the debt. And if you're not getting 26 [bps] in kind on the asset side, then that's really coming out of your pocket."[34] Capra Ibex's Michael Kurinets raised the same concern: "If all CLO liabilities transition from LIBOR to SOFR at the recommended spreads but leveraged loans transition at spreads lower than recommended, the effect will be lower cash flows to CLO equity. This would make CLO equity less valuable."[35]

141. CLO equity investors and CLO managers thus had a shared incentive to conspire to raise borrowers' interest payments.

142. In December 2022, Ian Walker, legal analyst at Covenant Review, identified the potential for collusion to distort competition and raise borrowing costs: "If lenders in fact start paying

---

[34] CLOUD 9FIN: *Talking Libor transitions with Dan Ko, Eagle Point Credit Management*, at 5:22 (Apple Podcast, June 22, 2023) https://podcasts.apple.com/us/podcast/talking-libor-transition-with-dan-ko-eagle-point/id1580559274?i=1000617976480 [https://perma.cc/KL5R-Z7BQ].

[35] Mike Kurinets, *CLO Insider January 2023: What Didn't Change When the Market Rallied*, CAPRA IBEX (Feb. 22, 2023), https://www.capraibex.com/post/clo-insider-january-2023-what-didn-t-change-when-the-market-rallied [https://perma.cc/EX7E-TLH4].

attention, and blocking the amendments that have either no spread adjustment or lower spread adjustments, then borrowers will have to come back with better terms."[36]

**B. January 2023: Defendants' Conspiracy Takes Flight**

143. At the beginning of 2023, approximately 80% of the $1.4 trillion U.S. leveraged loan market had not yet completed the transition to SOFR.[37]

144. At this pivotal moment when Class members were initiating large numbers of LIBOR-to-SOFR amendments, approximately 70 CLO equity investors participated in a January 2023 call organized by Eagle Point, led by Dan Ko.[38] During this call, first widely reported on January 24, 2023, investors conspired to form a coordinated working group to share leveraged loan amendment notices and collectively pressure CLO managers to oppose any amendment with less than the full ARRC-recommended CSA.[39]

145. On information and belief, representatives from each Defendant attended this January 2023 conference call.

146. CLO equity investors cannot vote directly on loan amendments. Instead, CLO managers cast votes on behalf of the CLO for the loans that the CLO owns. To effectuate their conspiracy, Defendants and their co-conspirators executed a pressure campaign instructing the CLO managers of the CLOs they owned to uniformly reject "insufficient CSAs"—namely,

---

[36] Paula Seligson, *Debt Investors Losing Millions on LIBOR Switch Start to Fight Back*, BLOOMBERG (Dec. 20, 2022), https://www.bloomberg.com/news/articles/2022-12-20/leveraged-loan-investors-losing-millions-on-libor-to-sofr-switch-fight-back?embedded-checkout=true [https://perma.cc/CN8C-MTTQ].

[37] This fell only slightly to 78% by January 12, 2025.

[38] Carmen Arroyo & Paula Seligson, *Fed-Up CLO Investors Push Managers to Reject Terms of Benchmark Switch*, BLOOMBERG (Jan. 24, 2023), https://www.bloomberg.com/news/articles/2023-01-24/fed-up-clo-buyers-push-managers-to-reject-terms-of-libor-switch [https://perma.cc/UD7B-B7YV]. ("Roughly 70 CLO equity investors attended a call hosted by Eagle Point Credit Management earlier this month where participants discussed pushing CLO managers to advocate harder for their economic interest, multiple firms that attended the meeting confirmed to Bloomberg").

[39] Ko, *supra* note 6.

anything short of the ARRC recommendations. As Michael Kurinets, Chief Investment Officer at Capra Ibex, explained, "Investors in CLO equity, who don't have the right to vote on amendments, will ask their CLO managers to make sure there are processes in place to oppose amendment notices within the five-day period, resulting in 'significant pushback' to companies [borrowers]."[40]

147. Bloomberg reported on January 24, 2023, that the meeting's participants were "particularly frustrated that some borrowers have been able to switch their existing loans to [SOFR] without including the [ARRC recommended] CSAs," allowing, in the CLO equity participants' view, "companies to reap significant savings at their expense."[41]

148. Thomas Majewski, Eagle Point, echoed these sentiments soon after in a Creditflux opinion piece. He stressed that "we have been disappointed by the failure of some CLO collateral managers to ensure that CSAs are implemented as intended [by the ARRC]" and noted CLO managers had "wilt[ed] in the face of amendment pressures."[42] He explained that, "[f]rom our seat, we see the fear of sponsor or underwriter retaliation and the potential to lose future [loan] allocations causing CLO collateral managers to think twice"[43] about pushing back against loan amendments, and he highlighted the need for collective action that was agreed at the January 2023 call: "But the CLO market is more than 60% of the loan market – so managers are not alone in this fight . . . Together, the CLO collateral manager universe can ensure loan issuers implement the ARRC's recommended CSAs – so long as we hold the line."[44]

---

40 Maurer, *supra* note 32.

41 Arroyo & Seligson, *supra* note 38.

42 Majewski, *supra* note 5.

43 *Id.*

44 *Id.*

149. Immediately after the January 2023 meeting, Defendants and other CLO equity investors organized systematic resistance to borrower amendment proposals, launching what Bloomberg described as an "outreach blitz" to CLO managers to ensure they would oppose low-CSA amendments on their behalf.[45] On February 2, 2023, Bloomberg reported:

> Since Eagle Point's call last month, CLO managers, the firms that often actually make the decision to accept or reject an amendment, have been inundated with requests to veto any transaction that doesn't use the biggest possible adjustment recommended by the ARRC. The outreach blitz appears to be paying off. "Banks acting as agents for amendments and loan issuers need to realize that lenders are rejecting anything that's offering 10 [bps] or below," said Capra Ibex's Kurinets.[46]

150. Creditflux reported that staff from Eagle Point, Fair Oaks, Livermore, Panagram, and Pearl Diver were among "some 70 people" participating in the working group established after the January 2023 conference call to block LIBOR-to-SOFR transitions with CSAs at rates lower than ARRC recommendations.[47]

151. Eagle Point's Dan Ko explained that "anyone in a CLO equity consortium [i.e., the working group] can flag up a loan amendment that hits their screens," to be "disseminated to other members of the group, along with a list of the loan managers with the biggest exposure."[48] Ko explained that this information-sharing and pressure network allowed investors to coordinate objections across dozens of CLO managers whose CLOs Defendants and their co-conspirators had invested in to "ensure loan and CLO managers are pushing back against insufficient CSAs."[49]

---

45 Arroyo & Seligson, *supra* note 38.

46 Paula Seligson, *CLOs Are Winning Fights on Libor Switch With Millions at Stake*, BLOOMBERG (Feb. 2, 2023), https://news.bloomberglaw.com/capital-markets/clos-are-winning-fights-on-libor-switch-that-could-cost-millions [https://perma.cc/A8YQ-B3PL].

47 Ko, *supra* note 6.

48 *Id.*

49 *Id*.

152. Working group members openly acknowledged the group's existence and function. Capra Ibex CIO Michael Kurinets publicly stated on February 22, 2023, "CLO equity investors have organized and formed a working group to immediately notify each other of any off-market loan amendment that is being pushed through. At Capra, we immediately found all CLOs in which we own equity and notified our CLO managers that we expect them to object to any off-market proposal." [50] In that same article, Kurinets trumpeted Defendants' success raising CSAs: "We are pleased to say that as a result of our action and those of likeminded equity investors, many off-market loan amendments, though not all, have been denied." [51] Kurinets also highlighted how Capra Ibex and other conspirators had used press appearances in furtherance of their agreement: "To draw more attention to this issue, Capra has recently been interviewed by the press."[52]

153. Kurinets had previously confirmed on February 2, 2023, that as result of CLO equity investors' coordination, "CLO managers are getting organized and pushing back" against non-ARRC recommended CSAs.[53]

154. Eagle Point's Dan Ko stated publicly: "We thought it was important that CLO collateral managers present a united front," and that "CLOs are 60–70% of the loan investor base and they should not be letting 0–10bps loan CSAs pass."[54] And during a Creditflux podcast released on April 27, 2023, Ko discussed Defendants' collusion. He explained that "a bunch of CLO equity investors got together and realized that there wasn't enough focus, and all of these amendments were going through with zero CSA or maybe even 10 basis point CSA. You know,

---

[50] Kurinets, *supra* note 8.

[51] *Id.*

[52] *Id*.

[53] Seligson, *supra* note 46.

[54] Ko, *supra* note 6.

Eagle Point, I organized a call with 70 other equity investors to ensure that the collateral [CLO] managers would focus on this and push back and stop kind of getting bullied by the sponsors."[55]

155. When asked how CLO managers responded to Defendants' efforts, Ko confirmed the conspiracy worked to push CSAs higher, stating: "[T]he [CLO] managers I guess responding to our push, they know that the equity investors are ultimately the ones that are paying their bills, and you know I think that we've kind of put them on notice that we're watching."[56]

156. Two CLO investors told 9fin, a leveraged finance industry publication, that they were "jittery about the optics" of such coordination "given how hard regulators have come down on the CLO industry in the past."[57]

157. On a Cloud 9fin podcast eight days before USD LIBOR settings ceased on June 30, 2023, Eagle Point's Dan Ko said about the transition to SOFR, "We were very focused on it, early on . . . starting at the beginning of the year when we heard that a lot of these CLO managers were accepting kind of lower CSAs that came straight out of our pocket . . . So, it was [sic] until we as the CLO equity investor community, kind of stepped up and kind of put them on notice that we were focused on this and we were watching this. And that if they don't really act, then it comes out of our pocket and that could mean that in the future, we are going to be less willing to do transactions with those CLO collateral managers."[58]

158. When asked how contentious this debate was with CLO Managers and other market participants, Dan Ko again stressed the conspirators' market power and the effectiveness of their concerted action in ensuring that the CLO managers acted in unison:

---

55 THE LAST TRANCHE, *supra* note 9, at 20:54.

56 *Id.*

57 Saved Kadiri & Tanvi Gupta, *It's good to talk – But DOJ probe draws CLO industry ire (9fin)*, 9FIN, at 2 (July 24, 2025), https://9fin.com/news/fbe2b3d1-fb1b-4c86-89e3-c10c4c6a5253 [https://perma.cc/FAW2-F9GE].

58 CLOUD 9FIN, *supra* note 34, at 5:29.

> [I]t's hard for the CLO collateral managers to really fight against us. And I think for some of them, it felt like they were, it was an uphill battle in that the sponsors and the issuers and the banks were telling them, oh, you're the only one that's, you know, not agreeing to the lower CSA, even if that wasn't the case. And so now that they know that other [CLO] collateral managers are also putting up a fight or putting up, saying no to a non-ARRC CSA, it kind of helps them to, I guess, feel confident that they're not the only ones . . . And there were numerous of them that really thanked me for kind of getting the CLO equity community really focused on this so that both the CLO equity community and the CLO collateral manager community could really push back . . . .[59]

159. Defendants did not only threaten CLO managers with a loss of future business. They also threatened borrowers. Eagle Point's Dan Ko highlighted the risk to borrowers if they failed to accept the ARRC-recommended CSA on June 22, 2023:

> "Now, fast forward to today, because we are about a, you know, a little over a week away from the deadline, and for a lot of these loans, I think that to the extent that you aren't able to switch over to SOFR, I think the fallback for a lot of them could become the [WSJ] prime rate, which obviously is an exceedingly kind of onerous rate if you go to prime. And so now a lot of these CSA amendments are just coming out with the ARRC recommended levels so that they don't get push back. And then if, for example, you're not able to get that consent, then you'll see kind of your loan pay off of prime, which obviously is not favorable to the issuers."[60]

160. The message was clear: agree to ARRC-recommended CSAs or risk paying the even higher WSJ Prime Rate, which was set as the fail-safe ABR under many leveraged loans. Defendants' threats and concerted efforts helped explain why, during the preceding week, "there were a slew of amendments . . . again most . . . 80% or so were at ARRC [recommended CSA levels.]."[61]

### C. Defendants' Conspiracy Raised Borrowing Costs

161. Defendants' and their co-conspirators' agreement was implemented immediately, and it worked.

---

[59] *Id.* at 6:45.

[60] *Id.* at 2:35.

[61] *Id.* at 3:42.

162. Shortly after the January 2023 meeting, Defendants and their co-conspirators successfully blocked several prominent proposed amendments that provided for a CSA below the ARRC recommendation:

a. **WellPet:** In late January 2023, lenders rejected Wellness Pet Company's proposed loan amendment transitioning to SOFR with a 10-basis point CSA. Due to the coordinated opposition generated by the working group, lenders registered "just enough opposition to block" the amendment.[62]

b. **Sinclair Broadcast Group:** In February 2023, lenders rejected the company's proposed amendment carrying a 10-basis point CSA, demanding a higher CSA.[63]

c. **CommScope and Viagogo:** CommScope and Viagogo saw their proposed LIBOR transition amendments, which carried 10 basis point CSAs, rejected as a result of Defendants' concerted efforts, forcing them to return with revised amendments that carried higher spreads.[64] Bloomberg reported that

62 Seligson, *supra* note 46. ("In recent weeks, lenders have successfully blocked proposed adjustments that they saw as too low from sports and news broadcaster Sinclair Broadcast Group, pet food firm Wellness Pet Co., ticket resale company Viagogo and communications equipment business CommScope"); Arroyo & Seligson, *supra* note 38. ("Last week, lenders rejected an amendment that would have flipped a $750 million first-lien loan for Wellness Pet Company to SOFR after the company only offered a so-called credit spread adjustment of 10 basis points.").

63 Carmen Arroyo, *Lenders Reject Sinclar Libor Loan Amendment with 10bps CSA*, BLOOMBERG LAW (Feb. 2, 2023), https://news.bloomberglaw.com/bankruptcy-law/lenders-reject-sinclair-libor-loan-amendment-with-10bps-csa [https://perma.cc/9YH4-DNCY]; Paula Seligson, *Scuffle in US Leveraged Loan Market Slows Down Libor Transition*, BLOOMBERG LAW (Feb. 7, 2023), https://news.bloomberglaw.com/bankruptcy-law/scuffle-in-us-leveraged-loan-market-slows-down-libor-transition [https://perma.cc/RF7Y-GH88]. In 2023, Defendant Eagle Point invested in numerous CLOs that held Sinclair's loan including Octagon 58, WIND 2013-2, WIND 2014-1, WINDR 2014-3, WINDR 2017-1, BlueMountain CLO 2018-1, STCR 2018-1A, STCR 2019-1A, and Regatta VII Funding Ltd. Similarly, Panagram invested in Ares LVI CLO Ltd., Ares LXI CLO Ltd., Carlyle US CLO 2020-2 Ltd., Carlyle US CLO 2021-2 Ltd., CIFC Funding 2020-II Ltd., Palmer Square CLO 2019-1 Ltd., TICP CLO XV Ltd., and Ares Loan Funding IV Ltd.

64 Seligson, *supra* note 46.

the CommScope loan ultimately transitioned to SOFR with ARRC-level CSAs in June 2023.

163. Based on available information, Defendants' owned CLOs that held portions of these loans whose amendments were rejected.[65]

[65] In 2023, Defendant Eagle Point invested in numerous CLOs that held Sinclair's loan including Octagon 58, WIND 2013-2, WIND 2014-1, WINDR 2014-3, WINDR 2017-1, BlueMountain CLO 2018-1, STCR 2018-1A, STCR 2019-1A, and Regatta VII Funding Ltd. Similarly, Panagram invested in Ares LVI CLO Ltd., Ares LXI CLO Ltd., Carlyle US CLO 2020-2 Ltd., Carlyle US CLO 2021-2 Ltd., CIFC Funding 2020-II Ltd., Palmer Square CLO 2019-1 Ltd., TICP CLO XV Ltd., and Ares Loan Funding IV Ltd. In 2023, Defendant Eagle Point invested in numerous CLOs that held CommScope's loans including Ares XLI CLO Ltd., Ares XLIII CLO Ltd., ARES 2017-44A, Ares XLIV CLO Ltd., Ares LI CLO Ltd., Battalion CLO XXIII Ltd., Bear Mountain Park CLO, BlueMountain CLO 2013-2 Ltd., BlueMountain CLO 2018-1 Ltd., BlueMountain CLO XXIII Ltd., BlueMountain CLO XXIV Ltd., BlueMountain CLO XXV Ltd., Bristol Park CLO, Ltd., Carlyle US CLO 2017-4, Carlyle US CLO 2018-1, Carlyle US CLO 2018-4, Carlyle US CLO 2019-4, Carlyle US CLO 2021-1, Carlyle US CLO 2021-4, Carlyle US CLO 2021-7, Carlyle US CLO 2022-1, Carlyle US CLO 2023-3, Dryden 53 CLO, Ltd., Dryden 64 CLO, Ltd., Dryden 68 CLO, Ltd., Dryden 85 CLO, Ltd., Dryden 94 CLO, Ltd., Dryden 109 CLO, Ltd., Eaton Vance CLO 2015-1, Eaton Vance CLO 2020-1, Eaton Vance CLO 2020-2, Kings Park CLO, Ltd., KKR CLO 36 Ltd., Madison Park Funding XXI, Madison Park Funding XXII, Madison Park Funding XXXIV, Madison Park Funding XLVII, Marathon CLO X Ltd., Marathon CLO XI Ltd., Octagon Investment Partners 26, Octagon Investment Partners 27, Octagon Investment Partners 29, Octagon Investment Partners 37, Octagon Investment Partners 44, Octagon Investment Partners 45, Octagon Investment Partners 46, Octagon Investment Partners 48, Steele Creek CLO 2018-1, Steele Creek CLO 2019-1, and Unity-Peace Park CLO, Ltd. Similarly, Panagram invested in Apidos CLO XXXII, Apidos CLO XXXVII, Ares LVI CLO Ltd., Ares LXI CLO Ltd., Ballyrock CLO 18 Ltd., Benefit Street Partners CLO XXI Ltd. Carlyle US CLO 2020-2 Ltd., Carlyle US CLO 2021-2 Ltd., Harriman Park CLO Ltd., Madison Park Funding LXII Ltd., Magnetite XXVII Ltd., Reese Park CLO Ltd., TICP CLO XV Ltd., Ares Loan Funding IV Ltd., Symphony CLO 35 Ltd., and Valley Stream Park CLO Ltd. which held CommScope's loans. In 2023, Defendant Eagle Point invested in numerous CLOs that held Viagogo's loans including Ares XLI CLO Ltd., Ares XLIII CLO Ltd. Ares XLIV CLO Ltd., Ares XLVII CLO Ltd., Ares LI CLO Ltd., Battalion CLO XXIII Ltd., BlueMountain CLO 2013-2 Ltd., BlueMountain CLO 2018-1 Ltd., BlueMountain CLO XXIII Ltd., BlueMountain CLO XXIV Ltd., BlueMountain CLO XXV Ltd., Carlyle US CLO 2017-4, Carlyle US CLO 2018-1, Carlyle US CLO 2018-4, Carlyle US CLO 2019-4, Carlyle US CLO 2021-1, Carlyle US CLO 2021-4, Carlyle US CLO 2021-7, Carlyle US CLO 2022-1, Carlyle US CLO 2023-3, CIFC Funding 2013-II, Ltd., CIFC Funding 2014, Ltd., CIFC Funding 2014-III, Ltd., CIFC Funding 2014-IV-R, Ltd., CIFC Funding 2015-III, Ltd., CIFC Funding 2019-III, Ltd., CIFC Funding 2019-IV, Ltd., CIFC Funding 2019-V, Ltd., CIFC Funding 2020-I, Ltd., CIFC Funding 2020-II, Ltd., CIFC Funding 2020-IV, Ltd., CIFC Funding 2021-III, Ltd., CIFC Funding 2021-VI, Ltd., CIFC Funding 2022-I, Ltd., CIFC Funding 2022-VI, Ltd., CIFC Funding 2023-I, Ltd., Cutwater 2015-I, Ltd. Income, Generate CLO 9 Ltd. Octagon Investment Partners 26, Octagon Investment Partners 27, Octagon Investment Partners 29, Octagon Investment Partners 44, Octagon Investment Partners 45, Octagon Investment Partners 46, Octagon Investment Partners 48, Octagon Investment Partners 50, Octagon 51, Ltd. Income, Octagon 58, Ltd. Income, Regatta VII Funding Ltd., Venture 41 CLO, Limited, Wind River 2013-2 CLO, Wind River 2014-1 CLO, Wind River 2017-1 CLO, Wind River 2017-3 CLO, Wind River 2018-1 CLO, Wind River 2019-2 CLO, Wind River 2022-2 CLO, Zais CLO 5, Limited, Zais CLO 6, Limited, and Zais CLO 7, Limited. Similarly, Panagram invested in Apidos CLO XXXII, Apidos CLO XXXVII, Ares LVI CLO Ltd., Benefit Street Partners CLO X Ltd., Benefit Street Partners CLO XXI Ltd., Carlyle US CLO 2020-2 Ltd., Carlyle US CLO 2021-2 Ltd., CIFC Funding 2020-II Ltd., CIFC Funding 2020-IV Ltd., CIFC Funding 2022-II Ltd., Elmwood CLO V Ltd., Magnetite XXVII Ltd., Magnetite XXXVII Ltd., and Elmwood CLO 15 Ltd. which held Viagogo's loans.

164. Bloomberg reported on February 2, 2023, that these rejections "have been led by investors that own bundles of loans known as [CLOs], and in particular the riskiest parts of these securities, called the equity[,]" and tied those efforts to the January call organized by Eagle Point, during which "[a]bout 70 holders of CLO equity discussed how to press for higher adjustments."

165. Moreover, preliminary economic analysis shows Defendants succeeded in artificially raising the interest rates applicable to Class members' loans. This artificial increase in interest rates paid by the Class is evident: (a) by comparing the total interest rate spread (margin spread plus CSA) paid by Class members to those paid by borrowers who agreed to new native SOFR loans; and (b) in the increase in the average CSAs paid by borrowers transitioning their USD LIBOR loans to SOFR via contractual amendment after Defendants' January 2023 meeting.

### 1. Defendants' Conspiracy Artificially Raised Prices of Transitioning Loans as Compared to New Native SOFR Loans

166. An empirical analysis can be conducted to isolate the impact of Defendants' conspiracy on interest rates paid by leveraged loan borrowers whose loans transitioned after the January 2023 call from broader market trends. Specifically, comparing the total interest rate spread (margin spread plus any CSA) paid under non-investment grade term loans following their amendment from LIBOR to Term SOFR to the total interest rate spread agreed under new native SOFR loans (loans indexed only to Term SOFR that did not need to transition) at origination. As both sets of loans occurred in the same U.S. leveraged loan credit market, one would expect total spreads to move consistently absent a conspiracy targeting LIBOR to SOFR amendments.

167. To perform this analysis, a dataset is constructed of transitioning leveraged loans and native SOFR loans from Bloomberg's term loan records.[66] This sample comprised of 793

[66] Specifically, the analysis used Bloomberg's record of term loans, denominated in dollars, and rated below investment grade by at least S&P, Fitch, or Moody's.

leveraged loans with a total aggregate notional amount of approximately $736 billion that transitioned from USD LIBOR to SOFR between January 2022 and April 2024, and maintained the same margin spread and interest tenor ("Transitioning Loan Sample").[67] It also comprised of 786 new leveraged loans originated between January 2022 and April 2024 indexed only to Term SOFR that did not transition from USD LIBOR ("Native SOFR Sample"). These new native SOFR loans had a total aggregate notional amount of $696 billion.[68] In both samples, the analysis excluded loans that transitioned to SOFR or were originated between January 1, 2023, and January 24, 2023, given uncertainty about the exact date of Defendants' January 2023 meeting.[69]

168. The analysis shows that the average total interest rate spread for loans transitioning after January 24, 2023, *increased* by 43 basis points compared to loans transitioning before January 2023, while the average spread for new native SOFR loans *fell* by 30 basis points over that same period. Had the average transitioning loan spread also fallen by 30 basis points, Class members would have paid, on average, 73 basis points less than they did after Defendants' collusion began.

169. Limiting the analysis to LIBOR loans that transitioned to SOFR on or before June 30, 2023, and new native SOFR loans originated by that date, leads to similar results. The average total interest rate spread of loans transitioning after January 24, 2023, but before July 1, 2023,

---

67 A random sample was analyzed of 85 of the transitioning loans included in its Transitioning Loan Sample. Bloomberg reported lender/holder information for all but 4% of these 85 loans. For the loans with lender/holder information, 100% were held by one or more CLO during the period between 3Q 2022 and 2Q 2023.

68 For this purpose, the analysis treated Bloomberg's record of the loan's effective date for the interest rate spread as the origination date. The difference-in-difference analysis further focuses on only the initial spread of these new native SOFR loans. There were 777 initial spread observations in the Native SOFR Sample, spanning a period from January 2022 until January 2024. As a robustness check, the same analysis as presented in Table 3 was performed using all the different spreads the new native SOFR loans carried throughout their lifetime, and the results were qualitatively identical.

69 It is apparent that the Eagle Point conference call occurred prior to January 24, 2023, given Bloomberg's reporting of it on that date. Arroyo & Seligson, *supra* note 38. Public comments by Capra Ibex's Michael Kurinets on January 13, 2023, suggests the meeting may have occurred earlier. Maurer, *supra* note 32. ("Investors in CLO equity, who don't have the right to vote on amendments, will ask their CLO managers to make sure there are processes in place to oppose amendment notices within the five-day period, resulting in 'significant pushback' to companies, said Michael Kurinets").

*increased* by 19 basis points compared to those that transitioned before January 2023, while the average total rate spread of new native SOFR loans *fell* by 16 basis points over that same period.

170. This divergence proves the increase in CSAs on LIBOR loans amended after Defendants' January 2023 meeting cannot be explained by broader market trends affecting the entire U.S. leveraged loan market. Indeed, the market trends reflected in the decline in total interest rate spreads for new native SOFR loans suggest that interest rate spreads for Class members' loans should have fallen, rather than increased, following Defendants' January 2023 meeting.

171. To further test whether this increase in total spreads payable under transitioning loans as compared to new native SOFR loans was statistically significant, a preliminary difference-in-differences regression model was prepared. Difference-in-differences analysis is a widely accepted econometric methodology used to isolate the causal effect of an event or intervention—here, the January 2023 CLO equity investors' coordination—from other market forces affecting pricing. The methodology compares changes in outcomes over time between a "treatment group" (entities directly affected by the alleged conduct) and a "control group" (similar entities not affected by the conduct). By examining how the treatment group's outcomes diverged from the control group's after the alleged collusion began, the analysis isolates the conspiracy's impact from market trends affecting both groups equally. Difference-in-differences models are valuable because they account for market factors influencing all market participants simultaneously.

172. Here, the difference-in-differences model compared total interest rate spreads on loans transitioning from LIBOR to SOFR with spreads on newly originated native SOFR loans.[70]

---

[70] The regression model can be defined as: $Spread_{i,t} = \beta_0 + \beta_1 * Treated_i + \beta_2 * Post_t + \beta_3 * (Treated_i \times Post_t) + \beta_c X_{c,i,t} + \epsilon_{i,t}$, where:

- $Spread_{i,t}$ is the total spread (sum of margin spread and CSA, if any)
- $Treated = 1$ for the loans that switch from LIBOR to SOFR

Both groups operated in the same credit market (the U.S. leveraged loan market) during the same period and faced identical Federal Reserve policies and macroeconomic conditions. Plaintiff's conspiracy theory predicts that only transitioning loans—the apparent focus of CLO equity investors' coordinated loan amendment objections—would experience artificially inflated rate spreads, while native SOFR loans would reflect competitive market conditions.

173. The data confirms this prediction: after January 24, 2023, and controlling for various factors affecting loan pricing,[71] spreads on native SOFR loans declined by 24–30 basis points on a relative basis (*see* results for "Post" in Table 3 below) consistent with improving credit markets, while spreads on transitioning loans increased. The regression finds that transitioning borrowers paid 47–73 basis points more than if transitioning loans followed the same trend evidenced in native SOFR loans in a competitive market—a statistically significant difference confirmed at the 99% confidence level across multiple regression specifications. This divergence provides powerful econometric evidence that Defendants' coordinated conduct, rather than legitimate market forces, artificially inflated Class members' borrowing costs.

---

- $Post = 1$ for observations after the January 2023 meeting
- $Treated_i \times Post_t$ is the interaction term which is equal to 1 for the loans that switched to SOFR after the January 2023 meeting. The parameter estimate for this term ($\beta_3$) indicates the differences-in-differences average treatment effect on the treated (ATT).
- $X$ represents a vector of control variables, which include the loan tenor (*see* "1-Month Tenor" in Table 3), credit rating (*see* "Rated Below BB" in Table 3), size (*see* "Size" in Table 3), and covenant-lite status (*see* "Covenant-Lite" in Table 3).

A positive and significant coefficient on the interaction term ($\beta_3$) would be consistent with the alleged collusion affecting LIBOR to SOFR transition amendments.

[71] Alternative model versions were run to control for loan credit rating (*see* "Rated Below BB" in Table [1]), loan size (*see* "Size" in Table [1]), whether the loan was covenant-lite (*see* "Covenant-Lite" in Table 3), and/or interest rate tenor (*see* "1-Month Tenor" in Table 3). Those alternative models (designated by columns I through V in Table 3) all confirm that Defendants' collusion had a statistically significant impact on the total interest rate spreads paid by Class members.

**Table 3. Preliminary Difference-in-Differences Regression Results**

| | (I) | (II) | (III) | (IV) | (V) |
|---|---|---|---|---|---|
| Intercept | 450.36*** | 278.75*** | 327.95*** | 333.29*** | 376.02*** |
| | (9.35) | (8.85) | (10.03) | (10.66) | (13.68) |
| Treated | -81.95*** | -75.70*** | -78.33*** | -76.02*** | -74.49*** |
| | (15.09) | (13.18) | (12.93) | (12.87) | (12.74) |
| Post | -30.34** | -24.41** | -26.92*** | -26.19*** | -24.78** |
| | (11.92) | (10.38) | (10.17) | (10.15) | (10.06) |
| Treated x Post | 72.50*** | 51.62*** | 58.29*** | 56.35*** | 47.43*** |
| | (17.82) | (15.70) | (15.38) | (15.36) | (15.37) |
| Rated Below BB | | 202.70*** | 192.18*** | 196.52*** | 191.24*** |
| | | (6.70) | (7.01) | (7.57) | (7.61) |
| Size | | | -0.04*** | -0.04*** | -0.04*** |
| | | | (0.00) | (0.00) | (0.00) |
| Covenant-Lite | | | | -18.30** | -18.46** |
| | | | | (7.74) | (7.68) |
| 1-Month Tenor | | | | | -45.39*** |
| | | | | | (9.22) |
| R-squared | 0.02 | 0.22 | 0.28 | 0.28 | 0.29 |
| R-squared Adj. | 0.02 | 0.22 | 0.27 | 0.28 | 0.29 |

*Note: Standard errors in parantheses. ***, **, * indicate statistical significance at 1%, 5%, and 10%, respectively.*

174. A separate analysis also tested whether the regression's results varied significantly if the Transitioning Loan Sample was expanded to include the 265 loans whose tenor or margin spread was also amended when the borrower transitioned from LIBOR-to-SOFR.[72] When these loans are included, the regression produces similar results, as shown in Table 4 below. This confirms that the statistically significant divergence in spreads between transitioned loans and new SOFR loans shown in Table 3 above was not driven by the fact that the Transitioning Loan Sample only includes loans whose tenors and base margin spreads remained constant.

[72] The Transitioning Loan Sample was limited to loans whose base margin and tenor remained constant before and after the amendment to better isolate the CSA's effect on total interest rate spreads, and thus the impact of the collusion on CSAs paid by the Class. Plaintiff does not concede, however, that Defendants' conspiracy did not impact Class members' base margin spreads.

**Table 4. Preliminary Difference-in-Differences Regression Results When Transitioning Loan Sample Expanded to Include LIBOR Loan's Whose Tenor and/or Base Margin Spread was Amended During the Transition to SOFR**

| | (I) | (II) | (III) | (IV) | (V) |
|---|---|---|---|---|---|
| Intercept | 450.36*** | 275.90*** | 329.49*** | 335.84*** | 368.80*** |
| | (9.35) | (8.72) | (9.82) | (10.38) | (12.57) |
| Treated | -75.16*** | -68.60*** | -73.04*** | -70.82*** | -74.19*** |
| | (14.40) | (12.46) | (12.19) | (12.14) | (12.00) |
| Post | -30.34** | -24.31** | -27.06*** | -26.16** | -25.06** |
| | (11.91) | (10.37) | (10.18) | (10.16) | (10.08) |
| Treated x Post | 77.84*** | 53.70*** | 61.63*** | 59.56*** | 54.25*** |
| | (17.03) | (14.94) | (14.59) | (14.57) | (14.59) |
| Rated Below BB | | 206.07*** | 195.07*** | 200.50*** | 196.54*** |
| | | (6.31) | (6.68) | (7.24) | (7.25) |
| Size | | | -0.05*** | -0.05*** | -0.05*** |
| | | | (0.00) | (0.00) | (0.00) |
| Covenant-Lite | | | | -22.21*** | -21.58*** |
| | | | | (7.23) | (7.21) |
| 1-Month Tenor | | | | | -35.80*** |
| | | | | | (7.94) |
| R-squared | 0.01 | 0.21 | 0.27 | 0.28 | 0.28 |
| R-squared Adj. | 0.01 | 0.20 | 0.27 | 0.27 | 0.28 |

*Note: Standard errors in parantheses. ***, **, * indicate statistical significance at 1%, 5%, and 10%, respectively.*

### 2. Defendants' Conspiracy Raised Average CSAs

175. The difference in CSAs included in loans that transitioned from LIBOR to SOFR via amendment before January 2023, and those that transitioned after January 24, 2023, was also analyzed using the Transitioning Loan Sample.[73]

176. That analysis shows clear evidence of a regime change after Defendants' January 2023 meeting. That regime change is most evident in leveraged loans utilizing a one-month tenor, which comprises the majority of the Transitioning Loan Sample (74% of total loans, and 77% of total notional loan value).[74]

177. The percentage of such loans transitioning without a CSA effectively halved after January 24, 2023, compared to the pre-January 2023 period (from 37.9% to 21.9%) while the

[73] Plaintiff expanded the Transitioning Loan Sample for this analysis to include two loans that transitioned from LIBOR-to-SOFR between June 2021 and December 2021. These loans were excluded from the Transitioning Loan Sample for the difference-in-differences analysis as there were no comparable native SOFR loans from this period.

[74] Bloomberg records very few leveraged loans utilizing a three-month tenor transitioned prior to January 2023, making it difficult to draw conclusions by comparing CSAs for three-month tenor loans at this stage.

percentage transitioning with the ARRC-recommended 11.45 basis point spread nearly doubled (from 26.2% before January 2023 to 50.0% after January 24, 2023):

**Figure 3. CSAs Applicable to One-Month Leveraged Loans that Transitioned Before January 1, 2023, and Between January 25, 2023, and June 30, 2023**




178. The average CSA paid by borrowers whose loans transitioned after January 24, 2023, and before the cessation of USD LIBOR on June 30, 2023, also increased by nearly two basis points compared to CSAs paid by borrowers whose loans transitioned before January 2023:

**Figure 4. Average CSAs Applicable to One-Month Leveraged Loans that Transitioned Before January 1, 2023, and Between January 25, 2023, and June 30, 2023**




179. These results provide further evidence that Class members paid supracompetitive interest as a direct result of Defendants' conduct.

**D. Defendants Are Subject to a DOJ Criminal Investigation**

180. In July 2025, Bloomberg broke the news that the DOJ was conducting a criminal antitrust investigation into whether CLO investors "colluded to bolster their positions as markets transitioned away from the scandal-plagued London interbank offered rate in early 2023[.]"[75] Bloomberg reported, "Antitrust prosecutors in New York have sent subpoenas to financial firms as they seek to determine whether investors with an equity stake in the $1.3 trillion CLO market illegally coordinated as the underlying buyout debt was repriced" during the LIBOR-to-SOFR

[75] Sisco & Arroyo, *supra* note 14.

transition.[76] The DOJ is examining "[c]ommunications between CLO equity holders near the [LIBOR] transition deadline."[77]

181. The evidence of Defendants' coordination described above is reinforced by economic and structural factors that both made this conspiracy feasible and demonstrate that the observed market outcomes are inconsistent with independent action.

## VI. PLUS FACTORS SUPPORT AN INFERENCE OF CONSPIRACY

182. Several factors, referred to as "plus factors," render the U.S. leveraged loan market highly conducive to collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and thus support an inference of collusion.[78] The following plus factors support an inference that Defendants' actions constituted an unlawful price-fixing conspiracy and not merely parallel conduct:

### A. Opportunities to Collude and High Level of Interfirm Communication

183. The CLO and leveraged loan industries are close-knit and deeply interwoven communities. Though CLO investors differ in form (*inter alia*, institutional investors, insurers, mutual funds, hedge funds, private equity funds, etc.), the equity tranche is heavily concentrated among a limited group of repeat participants as CLO equity's high-risk profile restricts ownership to a smaller pool of specialized investors. This reality, combined with Defendants' overlapping exposures, made communication and coordinated action among CLO equity investors feasible.

184. Trade groups regularly provide venues where equity investors' staff can speak to one another off the record. For example:

---

76 *Id.*

77 *Id.*

78 William E. Kovacic et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

a. **The Structured Finance Association** has a CLO Market Committee, on which Defendant Eagle Point currently sits as a Committee Chair, and hosts SFVegas annually.

b. **The Loan Syndications & Trading Association** ("LSTA") holds annual conferences discussing the CLO market. The 2022 LSTA conference in New York included a section on "Opportunities and Challenges for the CLO Market" that discussed the LIBOR transition and where Defendant Panagram's John Kim, Chief Executive Officer & Chief Investment Officer, served as a panelist.

c. **DealCatalyst** holds "The Annual CLO Industry Conference[,]" claiming it is the preeminent leveraged loan and CLO event of the year. According to its statistics, the conference offered 20+ hours of content and networking with 1,400 attendees, including 700 individuals from CLO managers and investors, 75 speakers, and over 300 meetings.

d. **Opal Group** holds an annual CLO summit. Its December 2022 summit was held in Dana Point, CA. It is a venue "designed for word-of-mouth networking opportunity 'hallway conversations,' the summit promoted meaningful dialogue from all angles within the industry, fostering mutually beneficial relationships." Defendants including Panagram and Eagle Point spoke or served as panelists at this event.

e. **The Financial Times** also holds the ABS East, a three-day gathering that brings together participants in the structure finance industry, for "72 hours of high-octane network building, intelligence gathering and dealmaking."

185. Senior staff at Defendants and their co-conspirators maintain social relationships across firms, either through business or through the networks that characterize the finance industry: schools, former colleagues, social clubs, and institutions.

186. Moreover, as the Complaint demonstrates, Defendants engaged in an unusually high level of interfirm communication directly, repeatedly, and contemporaneously with the LIBOR-to-SOFR transition, far exceeding what would be expected in a competitive market. Indeed, as noted above, the January 2023 call by Eagle Point Credit Management was attended by approximately 70 CLO equity investors.

187. Following the January call, CLO equity investors formed a "working group" specifically designed to share real-time amendment notices, identify which CLOs held positions in each loan, and coordinate pressure on those CLO managers to reject low-CSA proposals. This conflicts with typical practice in the finance industry, where working groups of competitors are limited to non-competitive topics such as pending governmental regulation.

188. But the coordination by the CLO "working group" was consistent with a growing trend of leveraged loan lenders collaborating to stifle creditor-on-creditor competition, often through inter-creditor cooperation agreements. Such agreements often involve contracts between two or more creditors of a single borrower that restrict those creditors from individually negotiating with the borrower on refinancings, amendments, or secondary-market transactions.

189. These inter-creditor cooperation agreements can prohibit cooperative members from selling to any investor that does not first agree to join the cooperative, further restricting a borrower's options by constraining competition for the borrower's leveraged debt business. In 2024 alone, 45 such creditor cooperation agreements were formed in the United States. These

agreements often involve the same repeat players, who frequently join multiple agreements across multiple borrowers, further distorting the market.

190. The "working group" formed by CLO equity investors took such cooperation agreements to an entirely new level by targeting every LIBOR-based leveraged loan in existence that needed to be amended to move to SOFR. Although apparently not reduced to a formal written contract, the CLO equity investors' "working group" agreement was just as effective at stifling competition and forcing higher prices on leveraged loan borrowers.

**B. High Level of Cross-Ownership of CLOs and Leveraged Loans**

191. As noted in Section III.D) above, Defendants and their co-conspirators maintain equity positions in many of the same CLOs and in CLOs operated by the same managers, and many of these CLOs hold leveraged loans issued to the same borrowers.

192. Defendants' and their co-conspirators' common equity holdings across CLOs (and across CLOs run by the same CLO managers), and those CLOs' holding of the same leveraged loans, incentivizes the CLOs not to compete among themselves for leveraged loan business by offering more favorable loan modification terms.

193. When competitors in an industry share common owners, competition suffers: "Economic theory has long shown that horizontal shareholdings can reduce the incentives of horizontal competitors to compete with each other."[79] The literature explains that a profit maximizing producer will seek to expand its market share by offering lower prices when the additional revenue obtained outweighs its interest in keeping market-wide prices high.

194. When economic ownership of rivals is separate, models prove firms have incentives to undercut their rivals' prices because the profits from additional sales exceed the resulting

---

[79] Einer Elhauge, *Horizontal Shareholding*, 129 HARV. L. REV. 1267, 1268 (MAR. 2016).

reduction in market price caused by their own conduct.[80] The premise on which these models rest is "that when a firm takes away sales by undercutting its rivals' prices, the firm's owners gain the profits from those sales but lose no profit on the sales taken away from their rivals."[81]

195. But where the industry involves common economic ownership, as here, a firm that cuts its price "simply moves their owners' money from one pocket to another," with the result that "the net effect of the price cut for those owners is that the prices charged by both firms are lower, thus lowering those owners' profits across both firms."[82]

196. Because of their cross-equity CLO holdings, and those CLOs' cross-ownership of leveraged loans in their portfolios, Defendants and their co-conspirators had no incentive to push any CLO manager to compete for market share by agreeing to no or low CSAs during the LIBOR-to-SOFR transition. Instead, these CLO equity investors' collective interests were served by CLOs uniformly rejecting LIBOR-to-SOFR amendments that did not include ARRC recommended CSAs, allowing CLOs to maintain higher margins.[83]

197. Each Defendant's substantial ownership of CLO equity and ability to control CLO managers, the small pool of repeat CLO equity investors and the CLOs' ownership of approximately 64% of all U.S. leveraged loans by value created the type of anticompetitive structure that Section 7 of the Clayton Act, 15 U.S.C. §18, forbids. By holding significant and overlapping equity positions and forming their working group, Defendants and their co-conspirators have been able to: (a) obtain access to sensitive, non-public information regarding

---

[80] *See id*. at 1269.

[81] *Id*. at 1269.

[82] *Id*. at 1269.

[83] *Id*. at 1274 ("The basic anticompetitive effects arise from the fact that interlocking shareholdings diminish each individual firm's incentives to cut prices or expand output by increasing the costs of taking away sales from rivals.").

loan pricing, benchmark selection, amendment strategy, and spread adjustments; (b) pressure or direct CLO managers to adopt uniform positions on benchmark-transition amendments, including requirements for higher CSAs; (c) require reporting and communications practices that allow Defendants and their co-conspirators to monitor whether CLO managers are adhering to these coordinated positions; (d) influence, replace, or threaten CLO managers whose conduct is inconsistent with Defendants' and their co-conspirators' preferred amendment or pricing strategies; (e) coordinate voting or consent decisions to block amendments or demand specific spread adjustments across multiple CLOs through public statements and private communications; and (f) otherwise shape the policies, decisions, and voting behavior of the CLOs and their managers in which Defendants and their co-conspirators maintain substantial equity stakes. These practices reduce competition among CLOs and other lenders in the U.S. leveraged loan market, suppress independent decision-making by CLO managers, and facilitate collusive outcomes that would not occur in a competitive market.

198. As Eagle Point's Dan Ko said of Defendants' and their co-conspirators' efforts: "It's hard for the CLO collateral managers to really fight against us."[84]

199. Defendants' and their co-conspirators' ability to influence and direct CLO managers means that their equity interests across competing CLOs pose competitive risks similar to those created by a merger of those CLOs. When competing CLOs are effectively brought under common control and influence, those CLOs—though nominally independent—face sharply reduced incentives to act independently in negotiating amendments, consenting to benchmark transitions, or competing over pricing and spread adjustments. The risk is heightened where, as

---

[84] CLOUD 9FIN, *supra* note 34, at 6:47.

here, Defendants and their co-conspirators are active participants in CLO governance and use their equity positions to influence or pressure CLO managers.

200. As Eagle Point's Ko said regarding Defendants' and their co-conspirators' efforts to push CLO managers to reject non-ARRC CSAs, CLO managers "know that the equity investors are ultimately the ones that are paying their bills, and I think that we've kind of put them on notice that we're watching."[85]

**C. Common Motive to Conspire**

201. Defendants and their co-conspirators had strong motives to strike and maintain their conspiracy. CLO equity holders, sitting at the bottom of the CLO payment waterfall, were the individuals who would suffer most should the loans comprising a CLO's asset base transition to SOFR with lower interest rates. This fact was, as noted above, exacerbated by Defendants' cross-holdings in the same CLOs and in Defendants' indirect cross-holdings in the same leveraged loans. It was also exacerbated by the fact that CLO managers' incentives are aligned with CLO equity investors given: a) they depend upon CLO equity investors to maintain and launch CLOs; b) they commonly retain an equity stake in the CLOs they manage; and c) like equity investors, much of their fee compensation sits at the bottom of the CLO payment waterfall. *See* Sections III.C) and III.D) above. The uniformity of Defendants', their co-conspirators', and CLO managers' incentives increased the ease, likelihood, and effectiveness of Defendants' coordinated action.

**D. Acts Against Individual Self-Interest**

202. In a competitive market, lenders, whether a bank or a CLO, must maintain interest rates at competitive levels to avoid losing customers. Absent Defendants' conspiracy, CLOs that could profitably accept lower CSA amendments would do so. In a competitive market, a CLO

---

85 THE LAST TRANCHE, *supra* note 9.

(and its manager and investors), whose success depends upon borrowers not defaulting or closing out their loan early, would be willing to accept lower CSAs rather than risk the borrower defaulting under the pressure of higher interest rates or the borrower (and its private equity sponsor) simply tapping the market for a new leveraged loan linked to SOFR and repaying its existing loan, thereby extinguishing the CLO's income flow. Moreover, CLO and CLO managers would also not risk alienating the private equity sponsors and banks that drive loan origination and secondary market trading, thereby interrupting their access regular deal flows by rejecting LIBOR-to-SOFR amendments they could profitably accept.

203. Moreover, CLO equity investors (and their advisers) would not, absent conspiracy, publicly call for the managers of CLOs they invest in to block amendments that were in the long-term interest of other CLOs and their note holders. Nor would they threaten not to do business with CLO managers who did not obey their directions regarding LIBOR-to-SOFR amendments. *See, e.g.*, ¶¶30, 152, 155, 157, and 224. Such unilateral conduct would tarnish that equity investor's reputation with CLO managers, making it more difficult for that investment adviser to secure access to future CLO equity investments.

**E. Market Structure Conducive to Collusion**

204. The U.S. leveraged loan market is susceptible to lender collusion because the loans are common financial products for borrowers who use them, leading to highly inelastic demand.

205. First, as explained in more detail in Section VII below, companies that depend on leveraged loans cannot feasibly switch to alternative financing mechanisms in the short term in response to an increase in loan pricing (which takes the form of an increase in the margin spread above the selected index). This made it easier for Defendants to raise interest rate costs for leveraged loan borrowers seeking to amend their leveraged loans from LIBOR-to-SOFR.

206. Second, leveraged loan lenders also benefit from significant barriers to entry. Entering the leveraged loan market as a lender is highly capital-intensive given the loan sizes. Human and financial capital is also required to invest and manage such debt. This includes credit research teams, trading and risk operations, and relationships with dealers and investment banks.

207. Relationships, reputation, and track record also provide institutional advantages to established leveraged loan lenders. The large investment banks and financial institutions that arrange leveraged loans prefer to invite into syndicates or allocate portions of leveraged loans to repeat buyers. Large repeat leveraged loan lenders tout this fact to attract investments.[86]

208. Consequently, a finite number of sophisticated lenders participate in the leveraged loan market.

## VII. DEFENDANTS HAD MARKET POWER IN THE RELEVANT ANTITRUST MARKET

209. Defendants' actions constitute a *per se* horizontal conspiracy to fix prices. Under that mode of analysis, Plaintiff is not required to prove that Defendants had market power in any defined antitrust market.

210. However, if the Court applies a rule of reason analysis to Plaintiff's claims, then the relevant product market is leveraged loans—secured public credit loans to non-investment grade companies—as explained below.

211. The relevant geographic market is the United States, principally because U.S. non-investment grade companies that want to borrow money, and lenders that want to lend to such U.S. borrowers, prefer to do so under credit agreements governed by U.S. law, denominated in U.S.

86 *See, e.g.*, *Why BlackRock for credit*, BlackRock, https://www.blackrock.com/institutions/en-global/investment-capabilities/strategies/credit [https://perma.cc/N8U3-EW7P] (last visited Jan. 20, 2026). (Blackrock noting that "Our scale, deep networks in liquid and illiquid markets, and track record of being a preferred capital provider for companies are core to our ability to generate alpha.").

currency, and subject to U.S. bankruptcy proceedings. Foreign capital markets, whose credit agreements are denominated in foreign currencies and reflect those countries' legal systems, including their taxation and bankruptcy/insolvency regimes, are not viewed as substitutes by participants in the U.S. leveraged loan market. If a U.S. non-investment grade company sought a foreign term loan, it would face currency risk—the risk that fluctuations in the foreign currency will affect the loan's value—and geopolitical risks—the risk the loan's value will be affected by factors such as the foreign country's monetary and trade policy. Similarly, lenders in foreign capital markets looking to lend to U.S. corporates would face additional credit risks not present when lending to domestic businesses stemming from the difficulties of enforcing a foreign law governed loan in the United States or bringing proceedings against a U.S. corporate abroad, particularly one with access to U.S. bankruptcy proceedings.

212. As a result, U.S. non-investment grade borrowers do not seek to borrow money in European or Asian capital markets in response to small but significant increases in the cost of U.S. leveraged loans. Similarly, foreign non-investment grade borrowers typically do not borrow money in the U.S. leveraged loan market.

### A. The Relevant Product Market Is the Leveraged Loan Market

213. The product market is the market for leveraged loans. In this market, creditors provide money to borrowers in the form of leveraged loans in exchange for contractually promised interest and repayment of principal. The "goods" sold in this market consist of credit offered through leveraged loans. Plaintiff and the Class are borrowers in this market, while the CLOs, Defendants, and their co-conspirators are creditors. That is, Plaintiff and the Class are the *buyers* of credit, while lenders are the *sellers*. The leveraged loan market encompasses both the "origination" market, where borrowers like Plaintiff establish new debt under a credit agreement, and the "secondary" market, where that debt trades after origination. Transactions in this market include debt origination, the

post-origination sale and purchase of parts of that debt, transactions amending credit agreements, and transactions refinancing already-issued debt.

214. Market participants recognize the leveraged loan market as a distinct market and monitor its performance separately from investment grade debt. Moreover, because investment grade corporates pose less credit risk, they receive better interest rates and covenants than are offered in leveraged loans. Consequently, as a practical reality, Plaintiff and the Class cannot substitute from the leveraged loan market into the investment-grade credit market.

## B. Alternative Financing Options for Non-Investment Grade Companies Are Not Reasonable Substitutes to Leveraged Loans

### 1. Private Loans Are Not a Reasonable Substitute

215. Private loans do not provide a substitute for leveraged loans. Private loan transactions operate outside the leveraged loan market under significantly different terms. Private loans resemble the earlier one-bank-one-loan model that existed before syndication and securitization became standard practice in the U.S. leveraged loan market. In typical private loan deals, a non-bank entity—either directly or through a private loan fund—provides capital to the borrower. Because private loan lenders cannot readily spread risk through syndication or securitization, they face concentrated exposure to individual borrower defaults.

216. This concentrated risk, combined with the illiquid nature of private loans, forces private lenders to charge substantially higher interest rates and impose far more restrictive terms than lenders in the leveraged loan market (e.g., lower debt/EBITDA ratios, financial maintenance covenants, more collateral, and stronger covenants). This price differential is exacerbated by the fact that private loans are historically sought by smaller companies presenting higher credit risk than leveraged loan borrowers. The differential to leveraged loans is substantial and persistent,

representing well above a marginal price increase. Indeed, private loans offered "a roughly 157 basis point average yield premium" over leveraged loans in the 10 years ending Q1 2024.[87]

217. Moreover, because private lenders lack the capacity to syndicate or securitize loans at scale, they generally cannot provide the capital volumes required by large leveraged borrowers. For these reasons, private loans are not a realistic substitute for leveraged loans for U.S. non-investment grade companies and many investors who want to lend to them.

**2. High-Yield Bonds Are Not a Reasonable Substitute**

218. Similarly, high-yield bonds do not provide an economic substitute to U.S. non-investment grade companies, even if certain of those companies issue high-yield bonds in addition to borrowing money under leveraged loans. A bond is a debt obligation that functions as an IOU. Investors lend money to the company issuing the bond in return for the company's promise to pay interest on the principal and return the principal when the bond comes due. High-yield bonds are bonds issued by non-investment grade U.S. corporates.

219. High-yield bonds have different terms and characteristics from leveraged loans, such that borrowers and investors do not view them as substitutes. For example, bonds cannot offer borrowers revolvers or delayed draw facilities. Further, bonds are typically unsecured debt, subordinated to other creditors, and come with a fixed, rather than floating, interest rate. Consequently, high-yield bond investors face greater credit and interest rate risk and so commonly demand higher interest rates than those charged on leveraged loans to comparable companies. This pricing differential is often exacerbated by the fact that historically, high-yield bonds see a greater default rate and lower recovery rates than leveraged loans. High-yield bonds also typically restrain

---

[87] Kevin Wolfson & Joseph Taylor, *Private Credit vs. Broadly Syndicated Loans: Not a Zero-Sum Game*, PINERIDGE INVS. (July 1, 2024), https://www.pinebridge.com/en/insights/private-credit-vs-broadly-syndicated-loans-not-a-zero-sum-game [https://perma.cc/PH6Q-JVSC].

a company's ability to prepay the debt, which limits a company's flexibility compared to leveraged loans. Finally, issuing high yield bonds is typically substantially more expensive for the borrower than establishing an equivalent size leveraged loan, in part due to the need to register with the SEC and pay larger arranger fees. Consequently, small non-transitory increases in the price of leveraged loans do not cause non-investment grade companies to move to the high-yield bond market.

### 3. Equity Financing Is Not a Reasonable Substitute

220. Equity financing likewise fails to provide a workable alternative to leveraged loans. Unlike debt investors who lend capital in exchange for repayment promises, equity investors purchase ownership stakes in the company. Business owners seeking to retain control over their companies cannot pursue equity financing without surrendering that control. Furthermore, equity issuance is often cost-prohibitive for leveraged borrowers because equity holders stand behind debt holders in the capital structure and therefore demand substantial ownership percentages or other significant concessions to compensate for their subordinated position.

## C. The Hypothetical Monopolist Test

221. Consequently, a hypothetical monopolist controlling the U.S. leveraged loan market could profitably impose sustained price increases or deteriorating loan terms upon borrowers at origination, amendment, or refinancing without losing business. U.S. companies with below-investment grade credit ratings have insufficient alternatives for raising capital. Private loans, high-yield bonds, and equity investment each fail as economic substitutes for leveraged loans and are at best complements, which explains why borrowers cannot realistically switch to these other capital sources when faced with leveraged loan price increases. Investment-grade credit remains entirely inaccessible to leveraged borrowers. Under these conditions, a monopolistic lender facing no competitive pressure could raise leveraged loan interest rates

without fear of losing borrowers to competitors. This is precisely what Defendants accomplished by dictating LIBOR-to-SOFR amendments include ARRC-recommended CSAs.

### D. Defendants Exercised Market Power in the U.S. Leveraged Loan Market

222. Defendants and their co-conspirators exercised market power in the U.S. leveraged loan market.

223. The price impact of their collusion, shown in Section VV(V.C), above, is direct evidence of that market power.

#### 1. Defendants' Own Statements Confirm Their Market Power

224. Defendants' own statements also attributed rising CSA levels (and thus interest costs) to their collusion. For example:

a. **Thomas Majewski**, founding and managing partner of Eagle Point (September 2023): Noted that after leveraged loans transitioned in 2022 without ARRC-recommended CSAs, "Eagle Point arranged a call with fellow CLO equity investors in January 2023. The CLO equity investor community voiced our objection to CLO collateral managers allowing non-ARRC spread adjustments on loans. A strong and consistent message from CLO equity investors to CLO collateral managers to not rollover in the face of sponsor [i.e., private equity companies that owned the borrowers] and agent bank pressures turned the tide, leading to a substantial majority of leveraged loans transitioning at the ARRC-recommended CSA, in step with CLOs. These outcomes reflect not only the importance of the CLO market to the loan market, but also CLO market participants' ability to collectively

and positively affect outcomes for the benefit of all CLOs."[88] Majewski concluded: "The CLO market has . . . flexed its muscles against aggressive loan agents and sponsors."[89]

b. **Mike Kurinets**, Chief Investment Officer, Capra Ibex (February 22, 2023): "At Capra, we immediately found all CLOs in which we own equity and notified our CLO managers that we expect them to object to any off-market proposal. We are pleased to say that as a result of our action and those of likeminded equity investors, many off-market loan amendments, though not all, have been denied."[90]

c. **Dan Ko**, Eagle Point (June 22, 2023): "The CLO equity investor community . . . stepped up and, kind of, put [the managers] on notice that we are focused on this we are watching this and . . . if they don't really act . . . in the future we're going to be less willing to do transactions with those CLO collateral managers . . . it's hard for the CLO collateral managers to really fight against us. And I think for some of them, it felt like they were, it was an uphill battle in that the sponsors and the issuers and the banks were telling them, oh, you're the only one that's, you know, not agreeing to the lower CSA, even if that wasn't the case. And so now that they know that other [CLO] collateral managers are also putting up a fight or putting up, saying no to a non-ARRC CSA, it kind of helps them to, I guess, feel confident that they're not the only ones . . . And, you know, there were

88 Majewski, *supra* note 12.

89 *Id*.

90 Kurinets, *supra* note 35.

numerous of them that really thanked me for kind of getting the CLO equity community really focused on this so that both the CLO equity community and the CLO collateral manager community could really push back . . ."[91]

**2. Market Analysts Confirmed Defendants' Market Power**

225. Market analysts shared Defendants' perception that their conspiracy effectively raised interest rates for borrowers:

a. Bloomberg reported on February 2, 2023, in an article titled "CLOs Are Winning Fights on Libor Switch With Millions at Stake" that "[i]n recent weeks, lenders have successfully blocked proposed adjustments that they saw as too low."[92]

b. On February 7, 2023, in an article titled "Scuffle in US Leveraged Loan Market Slows Down Libor Transition[,]" Bloomberg highlighted the CLO equity investors' effort to reject amendments without ARRC-level CSAs.[93]

c. On February 15, 2023, Bloomberg reported that "[e]quity investors of collateralized loan obligations have pushed back hard on these 'negative consent' loans and successfully organized lenders to reject multiple amendments [without ARRC recommended CSAs] in recent weeks."

226. During a podcast published on June 13, 2023, when asked how the CLOs and CLO equity investors were handling LIBOR to SOFR amendments, and specifically the negotiation of CSA terms, Tess Virmani (Deputy General Counsel, Co-Head – Public Policy at the LSTA)

91 CLOUD 9FIN, *supra* note 34, at 6:06.

92 Seligson, *supra* note 46.

93 Seligson, *supra* note 63.

stressed that CLO managers and CLO equity investors had worked together to block amendments without ARRC CSAs:

> [T]his has been a huge point of focus the CSA question over these last months of 2023. At the end of 2022 and even in January, you know, we saw quite a few transition amendments get done with ten basis points or even, you know, zero basis point CSAs. Then I think, you know, CLO managers and particularly CLO investors really started to focus on this issue and what it would mean if there is a disconnect in the CSAs and loans versus what the CLO notes are going to pay. And I think there was, it became one of the main points of focus and we've seen a really meaningful shift over these last few months toward ARRC level CSAs and Fallback amendments. In fact, I think the last data I saw was something like over 75% of CSAs included in May [2023] transactions were ARRC level of 11, 26, 43 basis points for one, three and six month term SOFR. So that's a meaningful shift.[94]

227. Finally, the limited public data available suggests that Defendants and their co-conspirators held equity positions with CLO managers whose CLOs held at least 30% of outstanding U.S. leveraged loans by value during the conspiracy period, and a piece of nearly every such leveraged loan.

228. First, as noted in ¶100, CLOs own approximately 64% of all U.S. leveraged loans by value and provided 61% of the funding for newly originated leveraged loans in 2024.

229. Second, as noted in ¶116, the top 30 CLO managers control CLOs that own approximately 37% of U.S. leveraged loans by value.

230. Third, as noted in Section IIIIII(III.D), above, publicly available evidence suggests that Defendants and their co-conspirators had equity positions in a significant portion of the CLOs in operation during the conspiracy period, and with most of the top 30 CLO managers.

## VIII. ANTITRUST INJURY

231. Defendants' anticompetitive conduct had the following effects, among others:

---

[94] LPC – LENDING LOWDOWN SERIES: *The Loan Market and the End of Libor*, at 13:26 (June 13, 2023), https://lpc-lending-lowdown.castos.com/episodes/episode-14-the-loan-market-and-the-end-of-libor [https://perma.cc/JA5E-BHGL].

a. reduced and restrained competition in the U.S. leveraged loan market;

b. raised, fixed, stabilized, and maintained the cost of borrowing in the U.S. leveraged loan market at artificially high levels; and

c. increased the cost of borrowing paid by Plaintiff and the Class in the form of higher interest rates and higher interest payments.

232. Defendants' violations of the antitrust laws caused Plaintiff and the Class to pay higher prices for leveraged loans in the United States than they would have paid absent Defendants' illegal conspiracy. As a result, Plaintiff and the Class suffered damages in the form of overcharges paid on their loan interest payments.

233. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## IX. LACK OF COUNTERVAILING FACTORS

234. Defendants cannot point to any legitimate business efficiencies that would overcome the strong presumption that their acquisition and holding of substantial equity stakes in competing lenders (CLOs) both threatened to reduce competition and actually reduced competition in the U.S. leveraged loan market. Traditional mergers sometimes generate meaningful efficiencies through economies of scale or operational synergies that can benefit other market participants, and ultimately, consumers. Defendants' purchase of equity positions in competing CLOs (and thus, leveraged loan lenders), however, creates none of these benefits. Unlike a full merger or acquisition, establishing equity positions in rival companies does not establish unified management, combine operations, eliminate redundant costs, or produce any of the other efficiency gains that can make some mergers socially beneficial. While Defendants' influence over leveraged loan lenders' decision-making may be less direct than if they had purchased these lenders outright, the potential for offsetting economic benefits is nonexistent.

235. The cross-holdings of CLO equity by Defendants, exacerbated by their conspiracy, introduces inefficiencies in the leveraged loan market, creating a deadweight loss that consumers bear when debt becomes more expensive and borrowers increasingly struggle to attract and service the debt they need to operate efficiently and compete in their industries.

## X. CLASS ALLEGATIONS

236. Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All borrowers who, as of January 1, 2023, were a party to a leveraged loan or second-lien loan whose interest rate was indexed to USD LIBOR with an operative maturity date on or after July 1, 2023, that was amended after January 1, 2023 to index the loan's interest rate to SOFR plus a positive credit spread adjustment.

237. Excluded from the Class are:

a. Borrowers whose loan agreements transitioned to SOFR by operation of the LIBOR Act;

b. Defendants and their officers and directors, as well as any employee of any Defendant who invested in CLOs; and

c. the Judge presiding over this action, the Judge's law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

238. **Numerosity**: Plaintiff does not know the precise number of Class members because such information presently is in the control of Defendants and other market participants. However, based on Bloomberg's records of leveraged loans that transitioned from LIBOR to SOFR after January 1, 2023, and the nature of the trade and commerce involved, there are at least several hundred Class members geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

239. **Typicality**: Plaintiff's claims are typical of the claims of the Class because Plaintiff borrowed at artificially inflated interest rates because of Defendants' conduct. Plaintiff's claims arise from the same common course of conduct giving rise to the claims Class members and the relief sought is common to the Class.

240. **Common Questions Predominate**: Questions of law and fact common to the Class include, but are not limited to:

A. whether Defendants agreed, combined, or conspired to fix, raise, or stabilize interest rates applied to loans transitioning from LIBOR to SOFR;

B. the identity of the participants in the alleged agreement;

C. whether Defendants' agreement violated Section 1 of the Sherman Act, 15 U.S.C. §1;

D. whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiff and Class members;

E. the effect of Defendants' agreement regarding loan interest rates on Plaintiff and Class members; and

F. the appropriate class-wide measure of damages, including whether Plaintiff and Class members are entitled to: (1) monetary relief, including treble damages; (2) interest from the date they should have received all monies rightfully owed; (3) attorneys' fees and costs; and (4) any other relief the Court deems just and reasonable.

These and other questions of law and fact common to the Class members predominate over any questions affecting only individual Class members.

241. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with, and not antagonistic to, other Class members who paid

inflated interest rates on leveraged loans. Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation. Plaintiff and its counsel are committed to vigorously prosecuting this action and have the resources to do so.

242. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual joinder of all Class members is impracticable given their geographic dispersion and number. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution means that, absent a class action, it would not be economically feasible for Class members to seek redress for the violations alleged herein. Individual litigation would present the potential for inconsistent or contradictory judgments and would magnify delays and expenses to all parties and to the court system. A class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

243. **Ascertainability**: Class members are readily identifiable due to the nature of public credit markets, including use of CUSIP numbers. Records establishing Class membership exist, including from Defendants, the CLOs they invested in, Bloomberg and other industry publications that maintain leveraged loan records.

## XI. CLAIMS FOR RELIEF

### COUNT I
### PRICE-FIXING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1

244. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

245. From at least January 2023 and continuing at least until the final LIBOR-based leveraged loan or second-lien loan transitioned by amendment to SOFR (and thereafter as the

effects of the amendments were implemented), Defendants participated in an agreement to fix, raise, and stabilize the interest rates applied to such loans transitioning from LIBOR to SOFR. Defendants conspired and agreed to jointly resist, including by pressuring the managers of the CLOs they owned, any borrower proposal that did not include an ARRC-recommended CSA, thereby artificially inflating the borrowing cost faced by borrowers.

246. In connection with their ownership and control of CLOs, Defendants directly profited from their unlawful agreement. By coordinating objections to borrower-proposed amendments and pressuring CLO managers to vote uniformly, Defendants ensured that interest rates would be set at artificially elevated, non-competitive levels, increasing the interest income flowing from borrowers of leveraged and second-lien loans to CLOs. This increased Defendants' own returns as CLO equity holders.

247. Defendants' conduct constitutes an unreasonable and unlawful restraint of trade in the U.S. leveraged loan market in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

248. As a proximate result of Defendants' unlawful conduct, Plaintiff and Class members have suffered, and continue to suffer, injury to their business or property. These injuries include, but are not limited to, paying artificially inflated and supra-competitive interest rates on leveraged and second-lien loans amended during the LIBOR to SOFR transition. Plaintiff and the Class are entitled to treble damages for Defendants' violations of the Sherman Act alleged herein.

## COUNT II
## ACQUISITIONS OF STOCK, ASSETS, OR OTHER SHARE CAPITAL IN VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. §18

249. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

250. Defendants' acquisition, holding, and coordinated use of their CLO equity rights—including their collective efforts to influence loan amendment votes, direct CLO managers' responses to LIBOR to SOFR transition amendment proposals, and otherwise exercise control over CLOs have had the effect of substantially lessening competition in the U.S. leveraged loan market, in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

251. At all times material herein, Defendants' activities, including their coordination of objections to amendments, sharing of competitively sensitive information, and uniform pressure on CLO managers, have occurred in and substantially affected interstate commerce.

252. Plaintiff is entitled to monetary relief under Section 4 of the Clayton Act, 15 U.S.C. §15, and to equitable relief under Section 16 of the Clayton Act, 15 U.S.C. §26.

## XII. PRAYER FOR RELIEF

Plaintiff respectfully prays that This Honorable Court:

A. Certifies this lawsuit as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), that Plaintiff Central Square be designated as Class Representative, that Plaintiff's counsel be appointed as counsel for the Class, and that the Court directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each and every member of the Class;

B. Adjudge and decree that Defendants violated each federal law set forth above;

C. Award Plaintiff and the Class damages, subject to trebling;

D. Award reasonable attorneys' fees, costs of suit, including costs of consulting and testifying experts, and pre- and post-judgment interest;

E. Grant such other, further, and different relief as may be just and proper.

## XIII. JURY TRIAL DEMANDED

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

Dated: January 21, 2026

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**

/s/ Amanda F. Lawrence
Patrick J. McGahan*
Amanda F. Lawrence
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: 860-638-9328
Facsimile: 860-531-2606
pmcgahan@scott-scott.com
alawrence@scott-scott.com

Patrick J. Coughlin*
Jimmy S. McBirney*
Sean C. Russell*
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
jmcbirney@scott-scott.com
srussell@scott-scott.com

Kyle Pozan*
Consuela M. Abotsi-Kowu*
**LOCKRIDGE GRINDAL NAUEN PLLP**
1165 North Clark Street, Suite 700
Chicago, IL 60610
Telephone: 312-205-8968
kjpozan@locklaw.com
cmabotsi-kowu@locklaw.com

Brian D. Clark*
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone: 612-339-6900
bdclark@locklaw.com

*Counsel for Plaintiff and the Class*
* *Pro hac vice forthcoming*